RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

         *Plaintiff-Appellee*,

    *v.*

ROBERT CORTEZ BURRELL,

         *Defendant-Appellant*.

> No. 23-1261

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:21-cr-20395-1—Robert H. Cleland, District Judge.

Argued:  July 23, 2024

Decided and Filed:  August 15, 2024

Before:  GILMAN, GRIFFIN, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Wade G. Fink, WADE FINK LAW P.C., Birmingham, Michigan, for Appellant. William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.  **ON BRIEF:**  Wade G. Fink, WADE FINK LAW P.C., Birmingham, Michigan, for Appellant.  William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

RONALD LEE GILMAN, Circuit Judge.  After almost four months of gathering evidence to corroborate an anonymous tip, agents with the Drug Enforcement Administration (DEA) applied for and executed four search warrants on residences associated with Robert Cortez Burrell.  They recovered over two kilograms of illegal narcotics, several firearms, and

drug-manufacturing equipment. Following a jury trial, Burrell was found guilty of being a felon in possession of firearms and ammunition as well as guilty of various related drug crimes. He was sentenced to 180 months of imprisonment.

Burrell now challenges the district court's denial of his motion to suppress the evidence obtained from the execution of the search warrants, the court's denial of his motion to dismiss the firearms and ammunition charges due to their alleged infirmity under the Second Amendment to the U.S. Constitution, and the court's admission of testimony that he contends violated the Confrontation Clause and the Federal Rules of Evidence. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

In September 2020, Renee Slaughterbeck called the DEA to submit anonymous information regarding Burrell's illegal drug activities. Slaughterbeck reported that Burrell was conducting an extensive drug-trafficking operation from residences at 1774 College Avenue, Lincoln Park, Michigan (College Avenue), and 17067 Arlington Avenue, Allen Park, Michigan (Arlington Avenue). She further said that Burrell used rental cars to conduct his operation and that he was usually armed. DEA agents reviewed Burrell's criminal background and discovered five previous convictions, two of which were drug related. With this information, and to corroborate Slaughterbeck's report, the agents began surveilling Burrell.

The agents observed Burrell making frequent visits to College Avenue and holding short-term interactions with others. Such interactions, according to experienced DEA agents, are consistent with drug transactions. In October 2020, the agents observed Burrell traveling in a rental car from College Avenue to a grocery store in Oregon, Ohio. Burrell parked his vehicle, walked over to a parked Pontiac, and then opened and entered the driver's side of the Pontiac. He then walked back to his vehicle and drove away less than one minute later. The DEA agents continued to observe the Pontiac and reported what they had seen to the Ohio State Highway Patrol.

About three hours after Burrell had left the grocery-store parking lot, Stephanie Harris entered the Pontiac. Harris was pulled over minutes after exiting the parking lot for a traffic violation. Police dogs alerted officers to the presence of narcotics. Harris was then placed in a police cruiser, where she attempted to dispose of the heroin in her possession. During her interview with police, Harris said that she had purchased the heroin from "Black," a person she had bought drugs from for at least 10 years. Her description of "Black" matched Burrell. She further disclosed that the typical drug transaction with "Black" was for her to place money in her parked vehicle for "Black" to retrieve in exchange for heroin.

Shortly thereafter, Slaughterbeck called the DEA agents again to report that Burrell had moved his drug operation from College Avenue to Arlington Avenue in response to Harris's arrest. Agents then began surveilling Arlington Avenue and served an administrative subpoena upon the utility provider for the residence. The utility provider produced bills showing Burrell as the resident, but listing his billing address as 822 Farnham Avenue, Lincoln Park, Michigan (Farnham Avenue).

During their surveillance, the DEA agents witnessed Burrell drive from Arlington Avenue to 211 Fairmont Street, River Rouge, Michigan (Fairmont Street) on several occasions. A review of law-enforcement databases revealed to the DEA agents that Fairmont Street was being actively monitored by the Michigan State Police as a residence that was being used for drug trafficking. Surveillance was maintained for nearly two weeks in November 2020. The DEA agents observed Burrell travel to various locations throughout the Detroit area. During these trips, Burrell conducted numerous visits lasting only a few minutes each, often held these visits from his vehicle, and interacted with others with lengthy criminal histories involving drugs.

The DEA agents next obtained a warrant to affix a GPS tracking device to one of the vehicles that Burrell utilized. Tracking information over a one-week period showed that Burrell made dozens of short-term visits to Arlington Avenue, College Avenue, Fairmont Street, and other locations.

GPS tracking data further revealed that, in December 2020, Burrell traveled from Michigan to a gas station in Sylvania, Ohio, only to return to Michigan after a brief stop. A review of security footage from that Ohio gas station confirmed that Burrell drove the vehicle to the station and conducted an interaction similar to what occurred in October 2020 at the grocery-store parking lot. He parked his vehicle, entered another parked vehicle after signaling the gas-station clerk to unlock it, and left in his own vehicle two minutes later.

Based on Slaughterbeck's anonymous tip, Burrell's criminal background, the results of on-the-ground surveillance, the GPS tracking information, Harris's interview, and a review of security footage from the Ohio gas station, the DEA agents applied for warrants to search the residences at Arlington Avenue, College Avenue, and Fairmont Street. On December 10, 2020, DEA agents and local police officers executed the three search warrants. They recovered 800 grams of fentanyl, hundreds of prescription pills, a kilogram of heroin, three handguns, dozens of rounds of ammunition, drug-trafficking equipment, and $15,000 in cash. Burrell was arrested at Arlington Avenue during the search of that residence.

In an interview with police, Burrell reported that his primary residence was Arlington Avenue, and that his wife owned College Avenue. He further disclosed that he sometimes lived at Farnham Avenue, and expressed concern that the DEA would search that residence as well. Based on the results of the prior searches, Burrell's confirmation that he occasionally stayed at Farnham Avenue, and the DEA agents' direct and GPS surveillance tying Burrell to that location, the agents applied for a search warrant for Farnham Avenue. The agents executed the search warrant later on December 10, 2020. They recovered 83 grams of cocaine and a hydraulic press used to press drugs into a brick.

**B.    Procedural background**

Following the execution of the four search warrants, Burrell was indicted on two counts of possessing with intent to distribute controlled substances (heroin and fentanyl), in violation of 21 U.S.C. § 841(a)(1); one count of maintaining a drug premises, in violation of 21 U.S.C. § 856(a)(1); one count of being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1); and one count of being a felon in possession of ammunition, in violation of

18 U.S.C. § 922(g)(1).  Burrell subsequently moved to suppress all evidence obtained from the four residences, as well as his statements made to police following his arrest at Arlington Avenue.

He argued that the warrants were issued in violation of the Fourth Amendment because the affidavits used to apply for the warrants improperly relied on an anonymous tip without sufficient corroboration, and that they failed to establish the necessary connection between illegal activity and the four residences.  The district court denied Burrell's motion.  Two weeks before the trial was scheduled to begin, Burrell moved again to suppress all evidence obtained from the execution of the search warrants.  He also moved to dismiss the indictment's counts charging him with being a felon in possession of firearms and ammunition.  Those counts, Burrell argued, should be dismissed pursuant to the then-recent Supreme Court decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

The district court denied both motions.  It reasoned that because Burrell submitted his motions almost six months after the motion-filing deadline, and that he had failed to point to any explanation for filing late, both motions were untimely.  And even if the motions had been timely, the court noted, they would have been denied.  The motion to suppress raised arguments that the court had previously dismissed.  As the court also highlighted, the motion to dismiss raised a facial challenge to the constitutionality of § 922(g)(1) that various courts nationwide had previously rebuffed.

Burrell then proceeded to trial.  The government called DEA special agent Zachary Snyder to testify.  Snyder was the lead investigator assigned to Burrell's case.  During his testimony, Snyder was asked about a staged traffic stop of Slaughterbeck.  He testified that Slaughterbeck had called him and reported that Burrell had tasked her with delivering drugs to Harris in Ohio.  Snyder, another DEA agent, and local law enforcement then staged a traffic stop to retrieve the drugs from Slaughterbeck.  When asked why law enforcement decided to do so, Snyder explained that Slaughterbeck had told him that she was worried that Burrell might assault her if she returned to Michigan without money for the drugs.  Burrell's attorney objected to the introduction of Slaughterbeck's statements as hearsay, but the district court overruled his objection, citing an exception to the hearsay rule.

At another point in his testimony, the government asked Snyder to describe the security-video footage retrieved from the Ohio gas station where Burrell had briefly visited and had entered a parked vehicle. He also testified about his interview with the clerk who worked at the gas station. The clerk, who had a history of criminal convictions, confirmed that she knew Burrell, but denied that Burrell sold her drugs. Snyder testified that he did not believe the clerk's story about why Burrell visited the Ohio gas station, given her association with Burrell and her criminal history. Burrell's attorney did not object to any portion of Snyder's testimony regarding why he thought the gas-station clerk lacked credibility.

The jury convicted Burrell on all counts in the indictment. The firearms and ammunition counts brought under 18 U.S.C. § 922(g)(1) were merged, and Burrell was sentenced to 180 months of imprisonment. This timely appeal followed.

## II.  ANALYSIS

### A.    The motion to dismiss the firearms and ammunition charges

The Federal Rules of Criminal Procedure grant district courts broad discretion to set deadlines for filing pretrial motions. *See* Fed. R. Crim. P. 12(c). A pretrial motion "is untimely if filed after a deadline set by the district court pursuant to Rule 12(c)(1)." *United States v. Trujillo-Molina*, 678 F. App'x 335, 337 (6th Cir. 2017). "But a district court may entertain an untimely motion 'if the party shows good cause.'" *United States v. Gulley*, 780 F. App'x 275, 282 (6th Cir. 2019) (quoting *Trujillo-Molina*, 678 F. App'x at 337). Good cause is a "flexible standard," but requires at least "some legitimate explanation for the failure to timely file." *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010) (citations omitted). When a party files an untimely motion in the district court, and the district court finds facts to determine whether the party has satisfied the good-cause standard, we review that determination under the abuse-of-discretion standard. *United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015).

In the present case, the district court set March 10, 2022, as the final deadline for filing pretrial motions. Burrell filed his motion to dismiss on September 6, 2022, and he failed to provide any explanation for the six-month delay. His motion, citing *Bruen*, raised a facial challenge to the constitutionality of 18 U.S.C. § 922(g)(1). The district court denied his motion

as untimely, noting the delay and lack of any explanation for the motion's untimeliness. It further held that because courts nationwide had dismissed *Bruen* challenges to § 922(g)(1), Burrell's claim lacked merit.

Burrell now raises both a facial and an as-applied challenge to the constitutionality of § 922(g)(1). He argues that good cause for filing late was "self-evident." Because *Bruen* was decided on June 23, 2022, Burrell notes that his motion to dismiss was just three months late. His trial counsel, Burrell argues, should not have been expected to anticipate dramatic shifts in the law or required to seek an extension of time in which to potentially file a motion based on a future decision of the Supreme Court.

But nothing in this case prevented Burrell from either (1) seeking an extension of the deadline for filing pretrial motions once *Bruen* was issued, or (2) explaining the reasons for the delay in his September 2022 motion. The parties had stipulated to move the deadline three times before. And Burrell has provided no legal support for the proposition that even where a party does not contend that it has good cause for a late-filed motion, a district court must nevertheless consider sua sponte whether such a cause was "self-evident." Because Burrell "provided no explanation for his delay in filing the motion," the district court did not abuse its discretion in denying Burrell's motion as untimely. *See Trujillo-Molina*, 678 F. App'x at 339.

Burrell alternatively argues that we should find that his trial counsel was ineffective. But "[o]ur typical approach to ineffective-assistance claims on direct appeal is to decline to address such claims unless 'trial counsel's ineffectiveness is apparent from the record.'" *United States v. Robinson*, 732 F. App'x 405, 414 (6th Cir. 2018) (quoting *United States v. Martin*, 668 F.3d 787, 797 (6th Cir. 2012)). Whether Burrell's counsel was ineffective is not clear. True enough, counsel failed to seek an extension of time in which to file the pretrial motion. But Burrell's contention that the outcome of his case would have been different had the district court considered his allegedly meritorious facial challenge to § 922(g)(1) is questionable. This court has recognized that "the extent of § 922(g)(1)'s constitutionality under *Bruen* is for now unsettled." *United States v. Alvarado*, 95 F.4th 1047, 1052 (6th Cir. 2024) (internal quotation marks omitted). And because "the record is not adequately developed for us to consider an ineffective assistance claim," we "cannot address that issue at this time." *See Walden*, 625 F.3d

at 967; *see also United States v. Zheng*, 27 F.4th 1239, 1243 (6th Cir. 2022) (noting that 18 U.S.C. § 2255 proceedings serve as the best forum for claims of ineffective assistance of counsel).

This leaves the issue of how to address the merits of Burrell's facial and as-applied challenges to § 922(g)(1). Burrell's motion to dismiss raised only a facial challenge to § 922(g)(1), so the plain-error standard applies to his as-applied challenge not raised below. *See Alvarado*, 95 F.4th at 1051 ("An issue raised for the first time on appeal is reviewed under a plain-error standard."). But Burrell has renewed the facial challenge that the district court dismissed as both untimely and meritless. Because he raised this claim below, Burrell argues that we should review it de novo, but he concedes that we should apply the plain-error standard if we conclude that the district court did not abuse its discretion in denying his motion as untimely. What standard of review should apply in this situation is unclear.

In *Soto*, 794 F.3d 635, this court considered the effect of changes to Rule 12 of the Federal Rules of Criminal Procedure. It held that the abuse-of-discretion standard applies to a district court's decision to dismiss a motion as untimely, and that the plain-error standard applies to arguments raised for the first time on appeal. *Id.* at 655. There is a gap in the caselaw regarding what standard of review applies when this court considers claims that (1) were included in motions that the district court denied as untimely, but (2) are renewed on appeal.

In *Trujillo-Molina*, 678 F. App'x at 335, this court held that the district court did not abuse its discretion in denying the criminal defendant's motion to dismiss his indictment because the motion was untimely, and the defendant failed to identify any good-cause reason for excusing the late filing. The *Trujillo-Molina* court did not apply the plain-error standard to the underlying claims of that late motion when the defendant renewed the same arguments on appeal. But in *United States v. Westley*, No. 22-3356, 2023 WL 5377894, at *10–12 (6th Cir. Aug. 22, 2023), this court applied the plain-error standard to claims renewed on appeal from a motion denied as untimely by the district court, concluding that such arguments should be treated as forfeited and reviewed for plain error. *Id.*

*Westley*'s approach strikes us as the better view. In *Soto*, this court concluded that the failure to timely file a motion results in a forfeiture. 794 F.3d at 656 ("[F]orfeiture is the failure to make the timely assertion of a right . . . ." (citing *United States v. Olano*, 507 U.S. 725, 733 (1993))). And we apply the plain-error standard of review to forfeited claims. *United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021). Reading these decisions together, the proper analysis proceeds as follows: (1) the abuse-of-discretion standard applies to the decision of a district court to dismiss an untimely motion, *Trujillo-Molina*, 678 F. App'x at 337 n.1 (citing *Soto*, 794 F.3d at 655); (2) the underlying claims from such an untimely motion are treated as forfeited, *see Soto*, 794 F.3d at 655; and (3) this court applies the plain-error standard to those forfeited claims raised again on appeal, *Montgomery*, 998 F.3d at 698.

We now apply this analysis to the case before us. Burrell's facial challenge to § 922(g)(1) was dismissed as untimely. Although he renews that same argument on appeal, we apply the plain-error standard to his claim. That same standard of review governs Burrell's as-applied challenge to § 922(g)(1), which he raises for the first time on appeal. *See Alvarado*, 95 F.4th at 1051.

Prior panels of this court have made clear that any challenge to the constitutionality of § 922(g)(1) cannot survive plain-error review. *See United States v. Johnson*, 95 F.4th 404, 417 (6th Cir. 2024) (as-applied challenge); *United States v. Philpot*, No. 23-3368, 2024 WL 3429177, at *7 (6th Cir. July 16, 2024) (facial and as-applied challenges). As those cases each note, the constitutionality of § 922(g)(1) remains unsettled across the circuit courts of appeal. "Without precedent explicitly holding that § 922(g)(1) is unconstitutional and because it is unclear that *Bruen* dictates such a result," *Johnson*, 95 F.4th at 417, Burrell's facial and as-applied challenges to the constitutionality of § 922(g)(1) fail.

## B. Denial of Burrell's motion to suppress evidence

Burrell next challenges the district court's denial of his motion to suppress evidence obtained from the search of his four residences. He argues that the affidavits supporting the search warrants that authorized those searches failed to establish probable cause because they

insufficiently corroborated an anonymous informant's tips and failed to prove a nexus between Burrell's residences and the alleged criminal activity.

In reviewing the denial of a motion to suppress, this court reviews the district court's factual determinations under the clear-error standard and its legal conclusions, including a probable-cause finding, de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016). All evidence is "assessed 'in the light most likely to support the district court's decision.'" *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)). That decision will be affirmed if it "can be justified for any reason." *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022) (quoting *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020)).

The Fourth Amendment requires that warrants be supported by probable cause. *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019). "Probable cause exists when an affidavit shows a 'fair probability' that the police will find evidence in the place they seek to search." *United States v. Ruffin*, 979 F.3d 528, 531 (6th Cir. 2020) (quoting *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018)). Our review of whether there was probable cause for the warrants to issue is limited to the "four-corners of the affidavit." *Crawford*, 943 F.3d at 305 (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). The conclusions drawn from the affidavit by the court that issued the warrants are afforded significant deference, such that the issuing court's "discretion [will] only be reversed if it was arbitrarily exercised." *Id.* (alterations in original) (quoting *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)).

### 1. *The anonymous informant's reliability*

The affidavits that supported the application for warrants in this case heavily relied on the information provided by Slaughterbeck, at the time an anonymous informant. "Anonymous tips . . . demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than reports from confidential informants." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005) (quoting *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003)). Officers working with a new informant "must take steps to verify that informant's reliability." *Ruffin*, 979 F.3d at 532.

This court "look[s] to the totality of the circumstances to determine whether an officer sufficiently verified the informant's honesty and 'basis of knowledge.'" *Id.* (quoting *Hines*, 885 F.3d at 923). The identity of the informant is "but one 'relevant consideration[] in the totality-of-the-circumstances analysis.'" *May*, 399 F.3d at 824 (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 233 (1983)). What matters is that the affidavits provided enough information that "buttressed the informant's information." *Id.* (quoting *United States v. Williams*, 224 F.3d 530, 532–33 (6th Cir. 2000)).

The three affidavits submitted to support the search warrants for Arlington Avenue, College Avenue, and Fairmont Street were identical. Each described the tips that Slaughterbeck provided in September 2020. And each was supported with an exhaustive accounting of what the DEA agents did to verify Slaughterbeck's tips.

Slaughterbeck reported that Burrell ran a drug-trafficking operation from both College Avenue and Arlington Avenue. A criminal background check on Burrell revealed two previous felonies involving "dangerous drugs," bolstering Slaughterbeck's report. While surveilling Burrell, the DEA agents observed him drive rental cars to conduct frequent short-term interactions with individuals across the Detroit area. Those short-term interactions, based on the experience of the investigating agents, were indicative of drug deals. And Burrell's use of rental cars to conduct these interactions corroborated what Slaughterbeck had reported would occur. The affidavits further described Burrell's drive to the Ohio grocery store to briefly enter Harris's parked car before traveling back to Michigan. Heroin was discovered in Harris's possession after she was arrested, and her description of her drug dealer matched Burrell. These facts further corroborated Slaughterbeck's report that Burrell would travel between Michigan and Ohio to conduct drug sales.

Taken together, this information is more than sufficient to find that Slaughterbeck's tips were reliable. The DEA agents were able to "verify key information received from the informant," *see Crawford*, 943 F.3d at 307, and thus their affidavits sufficiently "buttressed the informant's information," *see May*, 399 F.3d at 824. Viewing the totality of this evidence "in the light most likely to support the district court's decision," the warrants were supported by probable cause. *See Bateman*, 945 F.3d at 1005.

## 2.  *Nexus between Burrell's residences and criminal activity*

Burrell next argues that the affidavits supporting the warrants failed to state sufficient facts for a finding that evidence of his alleged drug activity would be found in his residences. The Supreme Court has made clear that to justify a search, circumstances must indicate why "evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.  "[I]n other words," according to this court, there must "be a 'nexus between the place to be searched and the evidence sought.'"  *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

That nexus "must be specific and concrete, not 'vague' or 'generalized.'"  *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 595).  "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented."  *Id.*  This court has concluded that a defendant's status as a drug dealer alone is insufficient to "give[] rise to a fair probability that drugs will be found in his home."  *Id.* at 383 (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)).  But this court recently recognized "the inference that 'in the case of drug dealers, evidence is likely to be found where the dealers live.'"  *United States v. Sanders*, 106 F.4th 455, 465 (6th Cir. 2024) (en banc) (quoting *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991)).

Burrell points to two cases in support of his argument that the affidavits in the present case "are laughably bare."  One is *Brown*, where this court determined that the search warrant at issue was invalid because the supporting affidavit "contained no evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there."  828 F.3d at 382.  The other is *United States v. Myles*, 307 F. Supp. 3d 676 (E.D. Mich. 2018), where a district court determined that the warrant to search the defendant's home and vehicle lacked probable cause for the same reasons.  *Id.* at 682 (citing *Brown*, 828 F.3d at 382).  These two cases, however, are easily distinguishable from the present facts.

Unlike the affidavits in *Brown* and *Myles*, the affidavits in the present case provided evidence that Burrell likely stored narcotics or the proceeds from drug sales at the four

residences. Slaughterbeck's initial tip informed the DEA agents that Burrell used both College Avenue and Arlington Avenue as bases from which to run his drug-trafficking operation. Surveillance of Burrell revealed that he partially lived at College Avenue and took frequent trips from there to conduct brief visits indicative of drug dealing. And the DEA agents observed Burrell leave College Avenue and drive to the parking lot in Ohio to enter Harris's car and leave shortly thereafter. Once Harris was arrested, she described someone matching Burrell's description as the person who would leave drugs in her car in exchange for money. All of this is sufficient to establish a nexus between College Avenue and illegal drug activity. *See United States v. White*, 990 F.3d 488, 490–91 (6th Cir. 2021) (finding a sufficient nexus when a defendant was observed leaving his home, dealing drugs, and returning home); *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) ("[A] 'defendant's record of past drug convictions coupled with recent, reliable evidence of drug activity' is sufficient to establish the nexus." (quoting *United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018))).

The same is true for Arlington Avenue. Slaughterbeck informed the DEA that Burrell had moved most of his operations to Arlington Avenue after Harris's arrest. The DEA agents then learned that Burrell was listed as the person responsible for paying the utilities at Arlington Avenue. Surveillance showed that Burrell continued to make frequent and brief trips indicative of drug dealing from Arlington Avenue. Indeed, Burrell traveled from Arlington Avenue to Fairmont Street, a residence under separate investigation for being a source of drug trafficking by the Michigan State Police. Before conducting an apparent drug deal at the Ohio gas station, Burrell left Arlington Avenue and stopped by College Avenue. A sufficient nexus is plainly demonstrated when there exists "[e]vidence that one leaves a 'residence, engage[s] in a drug transaction, and then return[s] into the residence.'" *Sanders*, 106 F.4th at 463 (alteration in original) (quoting *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011)).

Whether the affidavit provided facts to establish a nexus between criminal activity and Fairmont Street is a closer call. In addition to the Michigan State Police's investigation into Fairmont Street, Burrell was observed entering the residence for brief visits and interacting with known drug dealers at the home. Slaughterbeck reported that Burrell had transported drug-manufacturing equipment to Fairmont Street and worked to process narcotics at the

residence as well.  In order to demonstrate probable cause, the affidavit needed to establish (1) that Burrell was trafficking drugs; (2) that Burrell lived at the Fairmont Street residence; and (3) that evidence of drug trafficking would be found at Fairmont Street.  *See Sumlin*, 956 F.3d at 885.  The first and third requirements were likely met, but there is no evidence that Burrell ever lived at Fairmont Street.

This raises a question as to whether Burrell has standing to challenge the search of the Fairmont Street residence.  Burrell does not address this standing issue, nor does he specify what aspects of the affidavit for the warrant to search Fairmont Street were insufficient.  "[T]o claim the protection of the Fourth Amendment, [Burrell] must demonstrate that he personally has an expectation of privacy in the place searched."  *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  Because Burrell has failed to make such a showing, he cannot seek to suppress evidence obtained from Fairmont Street.

The Farnham Avenue affidavit raises no similar concerns.  Burrell admitted during his interview with police that he often resided at Farnham Avenue, and that his mother was the owner.  He also expressed concern during the interview that the DEA would search this residence.  The DEA agent swore, based on over nine years of experience in investigating drug crimes, that drug traffickers often store drugs at the homes of family members.  Burrell had been observed, through both direct and GPS surveillance, making short-term visits to the residence on several occasions.  Furthermore, the execution of the warrants on the other three homes had resulted in the recovery of significant quantities of drugs and drug-manufacturing equipment, which raised the inference that drugs would likely be found at another residence tied to Burrell.  *See Sanders*, 106 F.4th at 462 (finding that facts establishing the defendant's residence and criminal activity, taken together, are sufficient to raise an inference that the defendant "keeps the 'instrumentalities and fruits' of his crime in his residence" (quoting *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008))).

Based on these facts, all four affidavits established a sufficient nexus between the place to be searched and evidence of criminal activity.  After all, "[a]n affidavit need only present . . . a 'minimally sufficient nexus between the illegal activity and the place to be searched

. . . ."  *United States v. Christian*, 925 F.3d 305, 313 (6th Cir. 2019) (en banc) (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016)).

### 3.  *The good-faith exception*

Even if we had concluded that any of the affidavits failed to establish probable cause, the DEA agents' reliance on the warrants was still proper.  In *United States v. Leon*, 468 U.S. 897, 905 (1984), the Supreme Court held that evidence "seized in reasonable, good-faith reliance on a search warrant" will not be suppressed, even when that warrant "is subsequently held to be defective."  The good-faith exception requires us to "ask 'whether a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)).  If the answer to that question is "yes," then suppression is appropriate. *Id.*

There are four circumstances in which an officer's reliance on the search warrant would have been unreasonable. *See Leon*, 468 U.S. at 923.  Burrell points to one of these circumstances to argue that the four warrants were "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 611 (1975) (Powell, J., concurring)).  Such a warrant "has come to be known as a 'bare bones' affidavit." *White*, 874 F.3d at 496 (quoting *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)).  Bare-bones affidavits "nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied." *Sanders*, 106 F.4th at 468.  Such an affidavit "states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *White*, 874 F.3d at 496 (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

Burrell contends that the four warrants are all "bare bones" because they rely too heavily on uncorroborated information supplied by just one anonymous informant.  But this argument ignores what is contained within "the four corners" of the affidavits.  As discussed above, the affidavits contain detailed facts showing the extensive efforts that the DEA agents undertook to

corroborate what Slaughterbeck reported.  The affidavits did not simply state conclusions or rely on vague speculation.

"[W]here it is simply debatable whether probable cause exists, an officer is justified in relying on a judicial finding of probable cause."  *United States v. Neal*, 106 F.4th 568, 573 (6th Cir. 2024) (per curiam).  As such, even in the absence of probable cause, the *Leon* good-faith exception would apply and prevent suppression of the evidence.  That is the situation before us.

**C.     Confrontation Clause and hearsay violations**

Burrell's next issue on appeal concerns trial testimony.  He argues that testimony from DEA agent Snyder regarding Slaughterbeck's out-of-court statements violates both the Confrontation Clause and applicable hearsay rules.  The government responds by contending that Burrell has waived these arguments by failing to object below, or that any error was at least invited.  Alternatively, the government argues that, under the plain-error standard, Burrell's claims fail.

Alleged hearsay violations are reviewed de novo.  *United States v. Johnson*, 79 F.4th 684, 700 (6th Cir. 2023).  But a failure to contemporaneously object to an alleged hearsay violation or Confrontation Clause error fails to preserve the issue for appeal, and this court reviews such challenges under the plain-error standard.  *United States v. Collins*, 799 F.3d 554, 584 (6th Cir. 2015).  To satisfy the plain-error standard, the error in the district court must have been "plain . . . , affected the defendant's substantial rights, and . . . seriously affected the fairness, integrity or public reputation of judicial proceedings."  *Johnson*, 79 F.4th at 703 (quoting *United States v. Fraser*, 448 F.3d 833, 841 (6th Cir. 2006)).

The government has mislabeled what occurred at trial as a waiver by Burrell.  *See United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021) ("Waiver is the 'intentional relinquishment or abandonment of a known right.'" (cleaned up) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993))).  It claims that because Burrell's attorney alluded to Slaughterbeck's statements throughout the trial, Burrell has waived any claim of error regarding the admittance of those statements.  The government, however, was the first party to ask Snyder

to repeat Slaughterbeck's out-of-court statements, to which Burrell's attorney objected on hearsay grounds (but not on Confrontation Clause grounds).

After the district court overruled the objection, Burrell's attorney appropriately cross-examined Snyder on Slaughterbeck's statements. But, because Burrell's attorney failed to cite the Confrontation Clause in his objection, we apply the plain-error standard to review that claim. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005) ("Because Defendant raised only a hearsay objection to these statements at trial, and did not challenge their admissibility on constitutional grounds, our review here is governed by the plain error standard.").

The Confrontation Clause of the Sixth Amendment guarantees every criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "Ordinarily that means the defendant must be permitted to cross-examine the prosecution's witnesses at trial." *United States v. Harrison*, 54 F.4th 884, 887 (6th Cir. 2022). "But when a witness can't testify at trial and hasn't been cross-examined, the Confrontation Clause forbids entry of the witness's statements that are: (1) testimonial and (2) hearsay." *Id.* Both parties accept that Slaughterbeck's statements were testimonial, but the government argues that the statements are not hearsay and therefore not violative of the Confrontation Clause.

The Federal Rules of Evidence generally prohibit the admittance of hearsay. Fed. R. Evid. 802. Hearsay is defined as an out-of-court statement that is repeated in court and offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Snyder was asked about the circumstances of arranging the staged traffic stop of Slaughterbeck. He first testified that Slaughterbeck had called him and told him that Burrell had tasked her with delivering drugs to Harris. Snyder also repeated what Slaughterbeck told him regarding why she was afraid to return to Burrell without the money or the drugs. Both of these pieces of testimony were thus out-of-court statements repeated in court.

These statements were not, however, introduced to prove the truth of the matter asserted. Had they been used to prove that Slaughterbeck had drugs for Harris or that Burrell was likely to assault Slaughterbeck if she failed to successfully complete the drug transaction, then they would

be inadmissible.  But the statements were elicited so that Snyder could explain why the DEA had agreed to create a staged traffic stop.  Statements offered for the limited purpose of explaining an officer's actions or "how certain events came to pass" do not violate the rule against hearsay.  *United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004); *see also* Fed. R. Evid. 803(3) (dictating that a "statement of the declarant's then-existing state of mind" is "not excluded" as hearsay).  And if an admitted statement does not violate the rule against hearsay, then it also does not violate the Confrontation Clause.  *Harrison*, 54 F.4th at 887 ("[T]he Confrontation Clause forbids entry of the witness's statements that are: (1) testimonial and (2) *hearsay*." (emphasis added)).

So, although Slaughterbeck's statements might have caused some prejudice to Burrell, their introduction through Snyder did not violate evidentiary rules against hearsay or the Confrontation Clause.  We note in passing that Rule 403 of the Federal Rules of Evidence permits a district court to exclude otherwise relevant evidence if the value of that evidence is substantially outweighed by the danger of unfair prejudice.  But Burrell did not object to the introduction of Slaughterbeck's statements on this ground, the district court did not address the question, and Burrell makes no such argument on appeal.  We therefore have no basis to consider the possible application of Rule 403 to this case.

**D.      Improper credibility testimony**

Burrell's final issue on appeal is that the district court improperly allowed Snyder to comment on the credibility of the gas-station clerk during his testimony, in violation of the Federal Rules of Evidence.  Eliciting that testimony, according to Burrell, was prosecutorial misconduct.

Evidentiary rulings are typically reviewed under the abuse-of-discretion standard.  *United States v. Jaffal*, 79 F.4th 582, 594 (6th Cir. 2023).  But this court applies the plain-error standard when a party fails to object to an evidentiary issue at trial.  *United States v. You*, 74 F.4th 378, 388 (6th Cir. 2023).  Because Burrell did not object to the testimony of Snyder regarding the credibility of the clerk, we review the issue under the plain-error standard.

During the direct examination of Snyder, the government's attorney asked him whether he was concerned about the information that the clerk had provided him. Snyder responded that, because of the clerk's criminal background, he did not believe what she said about her relationship with Burrell. During cross-examination, Snyder confirmed that the clerk denied purchasing drugs from Burrell, which Snyder did not believe. The government's attorney clarified Snyder's testimony during redirect examination, and Snyder again said that he did not believe that the clerk was being truthful. Burrell claims that this series of exchanges demonstrates prosecutorial misconduct. He argues that "ask[ing] a law enforcement witness about whether someone else was lying or not" is improper. But he provides no support for this claim.

Prosecutorial misconduct occurs when a prosecutor vouches for or opines on the credibility of a witness. But Snyder, not the prosecutor, commented on the clerk's lack of credibility. *See Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993) (per curiam) ("Improper vouching occurs when a jury could reasonably believe that a prosecutor was indicating a personal belief in a witness' [sic] credibility."). Prosecutors also engage in misconduct when they improperly bolster a witness's testimony. That occurs "when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury." *United States v. Crawford*, 943 F.3d 297, 311 (6th Cir. 2019) (quoting *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999)). Here, the prosecutor neither commented on Snyder's testimony nor implied the existence of hidden evidence. Because Burrell's brief does not define the scope of his prosecutorial-misconduct claim and cites no caselaw in support, we conclude that there was no such misconduct.

Burrell next makes the conclusory argument that Snyder's testimony regarding the clerk violated Rules 401, 402, 608, 609, and 701 of the Federal Rules of Evidence. Rule 402 provides that relevant evidence is admissible. Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and if "the fact is of consequence." Relevance is a "low bar." *United States v. Wilder*, 87 F.4th 816, 819 (6th Cir. 2023) (quoting *United States v. Potter*, 927 F.3d 446, 452 (6th Cir. 2019)). The government contends that Snyder's testimony helped explain his perception of what the video

depicted.  Snyder's testimony also helped describe the similarity between Burrell's activity at the grocery-store parking lot and at the gas station.  Because Snyder's testimony has more than "the slightest probative worth," there was no violation of Rules 401 or 402.  *See United States v. Sumlin*, 956 F.3d 879, 888 (6th Cir. 2020) (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).

Rules 608 and 609 concern a witness's character for truthfulness, and when the truthfulness of a witness may be impeached.  True enough, Snyder commented on the credibility of the clerk.  But the clerk did not provide sworn testimony and was therefore not a witness.  *See Witness*, *Black's Law Dictionary* (11th ed. 2019) (A witness is "[s]omeone who gives testimony under oath or affirmation (1) in person, (2) by oral or written deposition, or (3) by affidavit"); *see also United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004) ("[A]s used elsewhere in the Federal Rules of Evidence, the term 'witness' appears to refer solely to someone whose testimony is actually offered as evidence at trial, and not merely someone with extensive knowledge of or involvement in the events at issue.").  Because the clerk was not a witness, the prosecution did not violate Rules 608 and 609.

This leaves Burrell's argument that Snyder's testimony regarding the clerk violated Rule 701 of the Federal Rules of Evidence.  Opinion testimony under Rule 701 must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Snyder personally viewed the security footage and interviewed the clerk, his testimony was helpful to understanding the DEA's investigation, and Snyder did not base his testimony on any specialized knowledge.  *See United States v. Young*, 847 F.3d 328, 351 (6th Cir. 2017) (finding no violation of Rule 701 from the testimony of an officer who personally participated in an investigation).  The prosecution accordingly did not violate Rule 701.

### III.  CONCLUSION

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court.