NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0453n.06

Case No. 23-1663

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 14, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ERIC ROGERS, | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: SILER, GRIFFIN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** In 2018, Eric Rogers and two other men orchestrated and participated in a series of armed carjackings. The government indicted Rogers for conspiracy to commit carjacking and numerous counts of aiding and abetting carjackings and aiding and abetting the brandishing of firearms during the carjackings. The jury found Rogers guilty on all counts. Rogers now challenges his convictions and sentence. For the following reasons, we affirm.

**I.**

Over a period of approximately two weeks in 2018, Rogers and two others carried out a series of carjackings in Detroit, Michigan. The first carjacking took place on May 25, 2018. Ashley Jones and her brother were in Jones's white Ford Fusion outside of a liquor store. Jones was in the passenger seat. While her brother was inside the liquor store, a man approached the driver's side of the car and pointed a gun at Jones. Still pointing the gun at Jones, the man entered the vehicle and drove away from the liquor store with Jones in the car. After driving down the street, the man stopped the car briefly another man opened the back door, looked in, and said to

the driver, "We good." R. 178, PageID 1529. The man then drove a few more blocks until stopping again to force Jones out of the car and demand that she empty her pockets. Once outside the car, Jones ran away, called 911, and hid.

On June 10, 2018, there were three more carjackings. Ladonna Tucker and Crystal Lane met in Tucker's driveway to leave in Tucker's blue Buick Enclave. As Lane opened the passenger door of Tucker's car, two men and approached and pointed guns at Lane and Tucker. The two men then robbed Lane and Tucker and drove off in Tucker's vehicle. Soon after, Denzel Wright and a passenger were parked outside of a bar in Wright's orange and black Challenger when two armed men approached them. After the two men robbed Wright and his companion, they took the car and left. Later that evening, as Laron Major sat in his parked black Pontiac Grand Prix with his windows rolled down, a man pointed a gun at him. The man pistol-whipped Major, knocking out his tooth, then pulled Major out of the car, jumped inside, and drove away. Major described the car that dropped off the man who carjacked him as a "[r]ed or orange . . . Challenger." R. 180, PageID 1985.

Early the next morning, the carjackings continued. Edward Strickland and his girlfriend were in Strickland's Lincoln Town Car outside of his cousin's house. A man then approached Strickland, put a gun to his head, and stole his car. As Strickland saw his carjacked vehicle driving away, he observed an orange Challenger following it. To Strickland, this indicated that the "two cars had to be together." *Id.* at 1819–20. Later that same morning, Keith Hedgespeth sat in his car as he refueled when an orange and black Challenger and a black Grand Prix pulled into the gas station parking lot near him. A man exited the Challenger and approached Hedgespeth with a gun. The man pointed the gun at Hedgespeth and told him to get out of the car. Hedgespeth ran away and watched his car, the Challenger, and the Grand Prix leave together. Later that day Rogers's

cousin, Jalessa Collins, saw Rogers in an orange Challenger that she had never seen him drive before. After surveillance video of Hedgespeth's carjacking became publicly available in late June, Rogers again saw Collins and showed her a video that she described as "a robbery or a carjacking." R. 179, PageID 1758–59. Rogers then asked Collins if she could tell that it was him in the video. Collins responded, "Yeah." *Id.* at 1759.

The final carjacking occurred on June 11 at approximately 5:00 a.m. when Christopher Lacey and his wife were delivering newspapers. As Lacey was restocking newspapers, a man approached him from behind and held a gun to his head. The man patted down Lacey, ordered Lacey's wife to get out of the car, and then drove off in his car. In the surveillance video of Lacey's carjacking, two other cars drove by, and one of them was orange.

Each of the carjacking victims reported the crimes by immediately calling 911 or visiting a police station soon after the event. The carjackings of Jones, Strickland, Hedgespeth, and Lacey were captured on surveillance video from adjacent buildings. On June 11, the final day of the carjackings, the police arrested Darius Garner while he was driving Major's stolen Grand Prix. Four of the carjacking victims identified him as one of their carjackers.

A grand jury indicted Rogers, Garner, and Deante Harvard on one count of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371; multiple counts of carjacking, in violation of 18 U.S.C. § 2119; and multiple counts of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). Garner and Harvard pleaded guilty, but Rogers proceeded to trial. At trial, the government presented evidence that connected Rogers's cell phone to six of the seven carjacking locations at the time of each event and his codefendants' cell phones to at least four of the seven. The trial evidence revealed that Rogers's DNA was on the steering wheel of the Jones's Ford Fusion and that there was a moderate likelihood that it was on the Challenger. Additionally,

Rogers's palm print was lifted from the passenger door of the orange and black Challenger. The government also introduced the surveillance videos and 911 call reports over Rogers's hearsay objection to the descriptions in the 911 reports.

Relevant to this appeal, during Jones's testimony, the government asked her if she recognized the defendant. Jones responded, "That's him. I recognize the eyes." R. 178, PageID 1535. Before Jones testified, a government attorney pointed out Rogers to Jones as the defendant on trial. At the end of that trial day, Rogers moved for a mistrial, arguing that Jones's in-court identification was unduly suggestive and tainted Rogers's chief argument that no victim had ever identified him. After briefing and oral argument the next morning, the district court denied Rogers's motion for mistrial because the identification was not so suggestive to violate Rogers's due process rights. However, by agreement of the parties, the district court struck Jones's statement from the record and instructed the jury three times to disregard that portion of her testimony from its consideration.

The jury found Rogers guilty on all counts. Rogers filed post-trial motions for a mistrial and for a new trial. The district court denied the motions. At sentencing, the district court found that Rogers was a career offender under the Sentencing Guidelines because he had been convicted previously of an unarmed robbery and a state drug-distribution offense. Rogers timely appealed.

## II.

On appeal, Rogers raises four arguments: (1) whether the district court erred in denying Rogers's motions for mistrial and a new trial based on the in-court identification by witness Jones; (2) whether sufficient evidence supports the verdict; (3) whether the district court properly admitted 911 call reports; and (4) whether the district court properly categorized Rogers as a career offender. We address each argument in turn.

**A.**

Rogers first argues that the district court erred in denying his requests for a mistrial or new trial based on the in-court identification by Jones. Generally, we review a district court's denial of a mistrial or new trial for an abuse of discretion. *United States v. Woods*, 14 F.4th 544, 557–58 (6th Cir. 2021). The government argues that plain-error review should apply because Rogers failed to contemporaneously move for a mistrial. We need not determine whether plain-error review is appropriate here because even under the more lenient abuse-of-discretion standard, Rogers's argument fails.

In appropriate situations, courts may grant mistrials or new trials when the government elicits inappropriate testimony from a witness. To be entitled to a new trial, "a defendant must show that the claimed error caused . . . serious or incurable prejudice to the defense." *United States v. Harvel*, 115 F.4th 714, 738 (6th Cir. 2024) (internal quotation marks omitted). As part of that analysis, we "first consider whether the challenged testimony was in fact improper." *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010). If it was, we must then determine if the testimony "was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." *Id.* at 459 (quoting *United States v. Smith*, 601 F.3d 530, 538 (6th Cir. 2010)). We employ the following factors in making that determination:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Id.* (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)).

To start, we assume that Jones's in-court identification was improper. Thus, our analysis proceeds to considering the prejudice factors.

The first and second factors seem to weigh in Rogers's favor. The government solicited Jones's identification of Rogers. The government contends it did so to head off the suggestion made during opening statements that DNA can transfer to objects innocuously, thinking Jones would say "no" as a way to suggest to the jury that there was no way he could have been in her Ford Fusion but for when he carjacked her. It was unreasonable to solicit Jones's identification of Rogers by asking if she recognized Rogers in this manner.

The remaining factors, however, favor the government. For factor (3), the district court struck Jones's statement identifying Jones from the record and gave the jury a curative instruction as soon as possible after Rogers raised concerns about Jones's in-court identification. Rogers did not raise the issue until the conclusion of the trial day. The district court reiterated the instruction after the jury questioned how much testimony the court struck. And the district court instructed the jury once more to disregard Jones's identification of Rogers as part of the final instructions to the jury before deliberations. The record reflects the clarity and forcefulness of the district court's instructions. *See United States v. Forrest*, 17 F.3d 916, 920–21 (6th Cir. 1994) (per curiam) ("Juries are presumed to understand and follow such directions from the court." (citations omitted)). As for factor (4), taking the government's examination of Jones as a whole, the brief line of questioning that resulted in Jones's identification of Rogers was not in bad faith. The government did not expect Jones to identify Rogers during her testimony as it was not the government's theory that Jones or any of the other carjacking victims would identify Rogers as one of the culprits. In the district court's words, Jones's identification "surprised everybody that was involved in the case." R. 183, Page ID 2234–35. Factor (5) likewise favors the government, and heavily so. As more fully discussed below, significant evidence demonstrates Rogers's involvement in the carjackings that renders Jones's stricken statement, even if the jury considered

it, only a "small part of the evidence against the defendant." *Howard*, 621 F.3d 433, 459 (quotation omitted). Overall, Rogers has failed to establish that Jones's in-court identification so prejudiced his defense as to require a new trial.

Although Rogers takes issue with this weighing of the prejudice factors, we discern no abuse of discretion in the district court's conclusion to the contrary. The lack of bad faith by the government, the clear admonitions by the district judge, and, most importantly (and to borrow from district court when it declined to order a new trial), the "strong" and "overwhelming" evidence of Rogers's guilt, collectively demonstrate that a mistrial is unwarranted. R. 183, PageID 2235. Because the identification testimony was not so clearly prejudicial to Rogers that the harm could not be erased by the court's multiple instructions to the jury to disregard the statement, the district court did not abuse its discretion in denying Rogers's mistrial and new-trial motions.

**B.**

Next, Rogers argues that the district court erred in denying his motion for judgment of acquittal because insufficient evidence supported the charges against him. We review de novo a district court's denial of a defendant's motion for acquittal. *United States v. Clay*, 667 F.3d 689, 701 (6th Cir. 2012). Our review assesses "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ledbetter*, 929 F.3d 338, 351 (6th Cir. 2019) (internal quotation marks omitted). We do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) (quotation omitted). And "we draw all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole."

*United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (internal quotation marks omitted). "Circumstantial evidence alone is sufficient to support a conviction." *Ledbetter*, 929 F.3d at 353 (quotation omitted). Defendants raising insufficiency-of-the-evidence arguments must satisfy a "very heavy burden." *Id.* at 351 (quotation omitted).

As mentioned above, the jury convicted Rogers of conspiracy to commit carjacking, multiple counts of aiding and abetting carjackings, and multiple counts of aiding and abetting the brandishing of firearms during the carjackings. Sufficient evidence exists in the record for a jury to find Rogers guilty of each offense.

We start with conspiracy to commit carjacking. For a conspiracy-to-commit-carjacking offense, the government must prove: (1) the conspirators willfully formed the conspiracy, (2) the defendant willfully joined the conspiracy, and (3) one of the conspirators knowingly committed an overt act identified in the indictment in furtherance of the conspiracy. *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* (quotation omitted). The evidence shows that Rogers and his codefendants went on a carjacking crime spree over a two-week period. Cell-phone evidence placed Rogers in the vicinity of most of the carjackings. Rogers's DNA was found on two of the carjacked vehicles, including the Challenger. His palm print was lifted from one of those vehicles. Rogers's cousin saw him driving the same vehicle that contained his palm print. Rogers tacitly confessed to that same cousin, showing her surveillance footage of one of the carjackings and asking "if [she] could tell if it was [Rogers]." R. 180, PageID 1959. Cell phones belonging to Rogers's codefendants were in the vicinity of several of the carjackings. This evidence constitutes circumstantial evidence that Rogers joined a carjacking

conspiracy and that Rogers knowingly committed overt acts (the armed carjackings) in furtherance of the conspiracy.

Rogers argues that there was insufficient evidence that a conspiracy was formed. But no "formal written agreement" is necessary; "a simple understanding between the parties will suffice." *Beverly*, 369 F.3d at 532 (citation omitted). The fact that the carjackings involved multiple culprits indicates an understanding between the coconspirators necessary to establish a conspiracy.

We proceed next to the substantive counts of aiding and abetting the carjackings. To be guilty of the offense of carjacking, one must (1) "with the intent to cause death or serious bodily harm," (2) "take[] a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another," (3) "by force and violence or by intimidation." 18 U.S.C. § 2119. To prove aiding and abetting, the government needed to prove that Rogers took actions to contribute to the carjackings with the intent to aid in the commission of the carjackings. *Cf. United States v. Bronzino*, 598 F.3d 276, 279 (6th Cir. 2010). The same evidence that supports the conspiracy-to-commit-carjacking offense also supports the aiding-and-abetting-carjacking offenses.

Rogers asserts that no victim identified him as the perpetrator of the crimes, and the circumstantial evidence does not support the jury's verdict. It is true that no victim ever identified Rogers. But the lack of direct evidence does not require that we overturn the verdict. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (opining that "circumstantial evidence alone can sustain a guilty verdict and . . . such evidence need *not* remove every reasonable hypothesis except that of guilt." (alteration and quotation omitted)). Collectively, the DNA and fingerprint evidence, cell-phone location data, Rogers's cousin's testimony, and the Challenger's connection

to the carjackings all support the jury's guilty verdict.  Rogers attacks his cousin's credibility.  We, however, "resolve all issues of credibility in favor of the jury's verdict, and it is not necessary for us to exclude every reasonable hypothesis but guilt."  *United States v. Johnson*, 79 F.4th 684, 711 (6th Cir. 2023) (quotation omitted).

As to the offenses of brandishing a firearm during the commission of the carjackings, Rogers does not raise an independent challenge to those convictions.  The trial evidence indicates that the carjackers brandished firearms during the carjackings.

## C.

Rogers next argues that the district court erred when it admitted the redacted 911 call reports concerning the carjackings because such reports constituted hearsay.  We review alleged hearsay violations de novo.  *United States v. Burrell*, 114 F.4th 537, 554 (6th Cir. 2024).  Still, "[t]he improper admission of hearsay" is subject to harmless-error review.  *United States v. Caver*, 470 F.3d 220, 239 (6th Cir. 2006).  Under that standard, we will not overturn a conviction "unless it is more probable than not that the error materially affected the verdict."  *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008) (quotation omitted).

Assuming the district court erred in admitting the 911 call reports, such error was harmless.  The information contained within the 911 reports is duplicative of, and less extensive than, the testimony by each of the 911 callers.  The call reports contain basic information such as the 911 call center operator, the caller's name and phone number, the time of the call, and a brief description of the reported event.  Notably, most of the event details in the admitted call reports were redacted.

It is more probable than not that the jury, even if the district court had not admitted the 911 call reports, would have reached the same verdict based on the significant evidence showing Rogers's involvement in the carjackings.

**D.**

Finally, Rogers argues that the district court improperly categorized Rogers as a career offender under U.S.S.G. § 4B1.1. We review a district court's legal interpretation of the Guidelines and consider whether a prior conviction constitutes a predicate offense under the Guidelines de novo. *United States v. Jones*, 81 F.4th 591, 597 (6th Cir. 2023).

"A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). Only the third criterion is at issue. The district court determined that Rogers met this third criterion based on his previous unarmed-robbery conviction and a conviction for delivering or manufacturing marijuana or synthetic equivalents under Michigan Compiled Laws § 333.7401(2)(d)(iii). Rogers challenges only the latter conviction. Specifically, he contends that his state drug conviction is not a "controlled substance offense."

We disagree. The Guidelines define a controlled substance offense as a federal or state offense, where the sentence could exceed one year of imprisonment, that "prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b)(1). Rogers argues that because the list of controlled substances criminalized under Michigan law includes a substance—

synthetic equivalents of marijuana—that is not prohibited under federal law, his prior conviction cannot serve as a predicate controlled-substance offense. We recently rejected this very argument in *United States v. Jones* and held that "state-law controlled substance offenses need not define controlled substances according to the Controlled Substances Act to count under § 4B1.2(b)" because the Guidelines explicitly incorporate state and federal law into a "controlled substance offense" analysis. 81 F.4th at 598 (citation omitted). Accordingly, the fact that Michigan may criminalize some substances that are not criminalized under federal law does not prevent conduct prohibited under the Michigan statute from qualifying as a predicate offense. Rogers's prior drug conviction under Michigan Compiled Laws § 333.7401(2)(d)(iii) is a controlled substance offense, and the district court did not err in finding that Rogers was a career offender.

## III.

For these reasons, we **AFFIRM** the district court's judgment.