RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RICARDO ALVARADO,

*Defendant-Appellant*.

No. 22-5459

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cr-00114-1—Katherine A. Crytzer, District Judge.

Argued: December 7, 2023

Decided and Filed: March 18, 2024

Before: SUTTON, Chief Judge; STRANCH and MATHIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Tess A. Chaffee, Patrick Maney, UNIVERSITY OF CINCINNATI, Cincinnati, Ohio, for Appellant. Samuel R. Fitzpatrick, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Nathan L. Colvin, UNIVERSITY OF CINCINNATI, Cincinnati, Ohio, Colter L. Paulson, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellant. Samuel R. Fitzpatrick, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Ricardo Alvarado was convicted of possessing a firearm as an individual with a felony conviction under 18 U.S.C. § 922(g)(1). The district court

sentenced him to 104 months' imprisonment after applying a four-level sentencing enhancement for reckless endangerment. Alvarado appeals both the conviction and sentence. He argues that his conviction violates the Second Amendment under the standard articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), an issue he raises for the first time on appeal, and that the evidence did not support a sentencing enhancement for reckless endangerment. We AFFIRM Alvarado's conviction but VACATE his sentence and REMAND to the district court for resentencing.

## I. BACKGROUND

Officers with the Blount County Sheriff's Office arrested Ricardo Alvarado in the mobile home park where he lived on April 20, 2020, after responding to reports that a man on the property was carrying what appeared to be a machine gun. Upon arrival, officers spotted Alvarado with a Ruger AR-556 semi-automatic rifle and ordered him to drop the weapon and drop to the ground. Alvarado complied with both orders and the officers handcuffed him and placed him under arrest.

After securing Alvarado, officers surveyed the scene, searching for evidence and interviewing witnesses. They found two .233 millimeter shell casings and two live rounds at the back door of Alvarado's mobile home where the unit opened on to a patio. They also identified three witnesses who would later testify at trial: Alvarado's wife, Maria Martinez, and his neighbors, Caleb Smith and Angela Hufflin. Officers eventually learned that Alvarado had two prior felony-level convictions, one for drunk driving and one for possession of marijuana.

The Government indicted Alvarado on a charge of felon-in-possession under § 922(g)(1). At trial, the Government called Smith and Hufflin as witnesses. Smith testified that on the day of the arrest he had been with a friend at a nearby store when the friend's mother called to say she had "heard a gunshot." Smith did not purport to have seen or heard the gunfire himself but testified that on his way back to the park he saw Alvarado walking across the grounds with the AR-556.

The Government next called Hufflin, a neighbor who lived in a unit near Alvarado's. Hufflin testified that on the morning of April 20 she was in her home when she heard gunshots,

rushed to the door to investigate, and saw Alvarado, a woman, and a child run past. Alvarado was carrying the AR-556. Hufflin did not testify to having seen the shots fired, but explained that they sounded "very close."

After the Government rested its case, Alvarado called his wife, Martinez, to the stand. On the day of the incident, Martinez had given a recorded video statement to officers in which she suggested that earlier in the day, she and Alvarado had a disagreement that prompted Alvarado to break her phone, leave the trailer home, and fire his rifle. Although she did not see Alvarado fire the gun, she reported that she had heard the "bee" of discharged bullets, ducked her head, and shielded her infant child. Martinez retracted these statements at trial, explaining that she had made them up because she had been "in shock" and wanted to "save" her family. She testified instead that someone else fired the shots while she and Alvarado were eating dinner.

Alvarado testified last. On the scene, Alvarado told officers that the AR-556 was his. On the stand, Alvarado denied owning the gun or possessing it on the day in question. He testified that it was someone else who fired the shots and who the officers had seen carrying the rifle, claiming that when officers ordered the shooter to drop the weapon, the shooter abandoned the gun and fled, leaving Alvarado near enough to the discarded rifle that officers misidentified him as the person who fired it.

The jury convicted Alvarado and the case proceeded to sentencing where the Government sought a two-level enhancement to Alvarado's base offense level for perjury and a four-level enhancement for reckless endangerment with a deadly weapon.

The court evaluated both Martinez's and Alvarado's testimony in considering the perjury enhancement. It discussed Martinez's "demeanor and credibility" during her trial testimony relative to her contemporaneous account given before there was "time to fabricate" or consider "that her husband could be convicted and sentenced to a severe term of imprisonment" based on her statements. The court expressed "serious doubts about" the "veracity" of Martinez's trial testimony, concluding it was likely false. Turning to Alvarado, the court found that his testimony was "directly contradicted" by three witnesses and that the "jury rejected Mr. Alvarado's testimony when it found him guilty of being a felon in possession of a firearm."

The court also concluded that Alvarado's story was "a lie" based on its "opportunity to view Mr. Alvarado's testimony live at trial" and its perception of his testimony as "knowingly untruthful." The court therefore found that Alvarado had "perjured himself."

The district court then considered the enhancement for reckless endangerment. It found that Alvarado had "recklessly engaged in conduct that placed both specific residents of the residential trailer park complex," and his wife, "in imminent danger of serious bodily harm" by "firing a Ruger AR rifle from a trailer" with "other trailers and individuals in close proximity." The court concluded that this amounted to reckless endangerment under Tennessee law and applied a corresponding four-level enhancement to Alvarado's base offense level. Given this enhancement, and the two-level enhancement for perjury, the court calculated Alvarado's guideline sentencing range as "92 to 115 months' imprisonment" and sentenced Alvarado to a period of incarceration of 104 months. Alvarado timely noticed this appeal.

## II. ANALYSIS

Alvarado appeals both his conviction and his sentence. He maintains that his conviction violates the Second Amendment and that his sentencing enhancement was not supported by the evidence. We address Alvarado's conviction and sentence in turn.

### A. Alvarado's Conviction

Alvarado contends that his felon-in-possession conviction violates the Second Amendment as applied to his prior convictions for drunk driving and marijuana possession, an objection he raises for the first time on appeal. An issue raised for the first time on appeal is reviewed under a plain-error standard. *United States v. White*, 58 F.4th 889, 893 (6th Cir. 2023). "To prevail under the plain-error standard, a defendant must establish '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *Id.* (quoting *United States v. Southers*, 866 F.3d 364, 366 (6th Cir. 2017)). An error is "plain" if it is "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

The Supreme Court has addressed the constitutionality of firearm regulations in three seminal cases: *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of*

*Chicago*, 561 U.S. 742 (2010), and, most recently, *Bruen*. In *Heller*, the Court held that the Second Amendment confers an "individual right to keep and bear arms" for "self-defense in the home." 554 U.S. at 595, 636. *McDonald* confirmed that this right is incorporated against the states. 561 U.S. at 791. *Bruen* then set out the test for determining when a firearm regulation violates the Second Amendment, holding that when "the Second Amendment's plain text covers an individual's conduct, the Constitution" protects that conduct unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. *Bruen* supplants the test that had previously emerged in lower courts. *See id.* at 19.

Given *Bruen*'s new standard, courts have begun to revisit the constitutionality of the federal felon dispossession law, § 922(g)(1). The Eighth Circuit upheld § 922(g)(1) under *Bruen*. It reasoned that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," including "persons who deviated from legal norms" and "persons who presented an unacceptable risk of dangerousness," concluding that Congress thus "acted within the historical tradition when it enacted § 922(g)(1)" to prohibit the "possession of firearms by felons." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023).

The en banc Third Circuit, on the other hand, sustained a challenge to § 922(g)(1) as applied to a would-be gun owner with a prior state-level conviction for making a false statement to obtain federal food stamps. *Range v. Att'y Gen. U.S.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc).[1] The Government had not, in its view, identified a "history and tradition" of revoking Second Amendment rights as a consequence for false statement convictions. *Id.*[2]

---

[1]The petitioner's prior offense in *Range* was classified as a misdemeanor under state law but served as a § 922(g)(1) predicate nonetheless because it was "punishable by up to five years' imprisonment." *Range*, 69 F.4th at 98. Under § 922(g)(1), anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" is banned from possessing a firearm—the provision does not specify that the crime must be a "felony." *See id.*

[2]The en banc Third Circuit consisted of fifteen judges who produced a total of six opinions, including four judges who signed on over a pair of concurrences and another four who dissented across three separate writings. *See Range*, 69 F.4th at 97 (majority opinion); *id.* at 106 (Porter, J., concurring); *id.* at 109 (Ambro, J., joined by Greenaway, Jr., & Montgomery-Reeves, JJ., concurring); *id.* at 113 (Shwartz J., joined by Restrepo, J., dissenting); *id.* at 116 (Krause, J., dissenting); *id.* at 138 (Roth, J., dissenting).

The Seventh Circuit has characterized "the historical evidence" on "whether the Second Amendment's protections apply to felons" as "mixed" and "therefore has not decided the question." *United States v. Hill*, No. 22-2400, 2023 WL 2810289, at *2 (7th Cir. Apr. 6, 2023) (order); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (remanding "to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)").[3]

Against this backdrop, the Government contends that § 922(g)(1) remains constitutional under *Bruen* because the historical record reveals a tradition both of "laws that categorically disarmed people who had shown disloyalty to the rule of law," and of "laws that punished felony offenses with complete forfeiture of all assets or with death." As evidence of the former, the Government identifies a litany of pre-ratification laws dating back to the English Bill of Rights that disarmed classes of people—including Catholics, Native Americans, and slaves—"who were viewed as outside the political community and thus outside the rule of law." It characterizes these laws as targeting groups who the relevant lawmakers believed "had shown disrespect, disobedience, or disloyalty to the law and the civic community—regardless of their dangerousness." As evidence of the latter, the Government explains that at the founding, legislatures would regularly "impose forfeiture and capital punishment for a variety of violent and nonviolent felonies," including crimes like forgery or counterfeiting. The authority to impose capital punishment for non-violent felony offenses, the Government reasons, necessarily included the power to levy the "relatively lenient sanction of disarmament through forfeiture of firearm rights."

Alvarado relies on many of the same sources as the Government but characterizes them at a lower level of generality. He argues that the categorical disarmament laws in place at the founding were directed at disarming individuals based on "dangerousness, mostly out of a particular concern about insurrection." This concern animated the disarmament of Catholics and other disfavored groups, he says, but it provides no basis for disarming an individual convicted of drug and alcohol related crimes, which carry none of the same concerns. As for laws that

---

[3]The district courts have produced more uniform results: The Government represents that "more than 170 district courts have rejected constitutional challenges to § 922(g)(1)." *Cf. Range*, 69 F.4th at 106. Still, at least one district court has offered a thoughtful rebuke to this consensus. *See generally United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023).

imposed capital punishment on non-violent offenses, Alvarado characterizes the regulations as historical outliers that cannot control the outcome today.  He also maintains that capital punishment is a distinct penalty from permanent disarmament, the relevant focus of the *Bruen* inquiry.

Whoever ultimately has the better of this argument, the extent of § 922(g)(1)'s constitutionality under *Bruen* is for now "unsettled."  *See Hill*, 2023 WL 2810289, at *2.  Circuit splits like this one generally preclude finding plain error because "the split is good evidence that the issue is 'subject to reasonable dispute.'"  *See United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (quoting *Puckett*, 556 U.S. at 135).  So although circuit courts considering the constitutionality of § 922(g)(1) as a matter of first impression have divided on the issue, courts considering it on plain-error review have reached a consensus, repeatedly recognizing that if there were "any error" in letting stand a § 922(g)(1) conviction under *Bruen*, it "would not be plain."  *Id.*; *see United States v. Fulwiler*, No. 23-30152, 2023 WL 7118748, at *1 (5th Cir. Oct. 27, 2023) (collecting cases) (per curiam).  As Alvarado's appeal was pending, our court joined this cross-circuit harmony.  *See United States v. Johnson*, No. 22-6048, 2024 WL 938081, at *6-7 (6th Cir. Mar. 5, 2024); *United States v. Bowers*, No. 22-6095, 2024 WL 366247, at *2-3 (6th Cir. Jan. 31, 2024).  We agree that the constitutionality of § 922(g)(1) under *Bruen* is subject to reasonable dispute and will not disturb Alvarado's conviction on plain error review.

### B.  Alvarado's Sentence

Alvarado also challenges the validity of his sentence, arguing that the district court improperly applied a four-level enhancement for reckless endangerment.  "We review the district court's legal interpretation of the sentencing guidelines de novo," review "its factual findings under the clearly erroneous standard," and accord "due deference" to its application of a sentencing enhancement under USSG § 2K2.1(b).  *United States v. Mukes*, 980 F.3d 526, 533 (6th Cir. 2020) (quoting *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014)).  When the district court misapplies a sentencing enhancement, we must remand for resentencing unless we are "certain" the error was harmless.  *United States v. McCarty*, 628 F.3d 284, 294 (6th Cir. 2010) (quoting *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008)).

1.      Sentencing Enhancement

The United States Sentencing Guidelines impose a four-level enhancement on the base offense level of a defendant who "used or possessed any firearm or ammunition in connection with another felony offense." USSG § 2K2.1(b)(6)(B). "Another felony offense" is a "federal, state, or local offense" that is "punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." *Id.* § 2K2.1(b)(6)(B) cmt. n.14(C). The Government carries the burden of establishing the sentencing enhancement by a preponderance of the evidence. *See Mukes*, 980 F.3d at 532, 536. The district court here enhanced Alvarado's sentence for reckless endangerment with a deadly weapon under Tennessee Code Annotated § 39-13-103.

The Tennessee Code makes it a felony to "recklessly engage[] in conduct that places or may place another person in imminent danger of death or serious bodily injury" while using "a deadly weapon." Tenn. Code Ann. § 39-13-103(a), (b)(2). The law's imminence requirement qualifies the scope of conduct that amounts to reckless endangerment by limiting it to those actions that place members of the public within the "zone of danger"—that is, within the area in which there is a "reasonable probability" of imminent "death or serious bodily injury." *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999). A mere possibility of danger is not enough. *State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996). Tennessee courts have cautioned that "potentially 'absurd' and 'unreasonable' results" could "arise from permitting" a reckless endangerment prosecution for "discharging 'a weapon under any circumstances where any other human being might possibly be present or where a stray bullet might possibly strike another person.'" *Id.* (emphasis omitted) (quoting *State v. Culbertson*, No. 03C01-9412-CR-00449, 1995 WL 512077, at *2 (Tenn. Crim. App. Aug. 30, 1995)).[4]

The Tennessee Supreme Court announced the "zone of danger" standard in *Payne*. *Payne* involved a defendant who twice in one week led law enforcement officers on high-speed car chases through residential neighborhoods. *Payne*, 7 S.W.3d at 26-27. During the first chase,

---

[4]Tennessee's imminence requirement distinguishes its reckless endangerment law from the model penal code and other state statutes that do not impose such a rule. *See Payne*, 7 S.W.3d at 28 & n.2 (citing Model Penal Code § 211.2).

the defendant fled from officers through a residential area in the middle of the night at speeds of up to 80 miles per hour. *Id.* at 26. At the time the chase occurred, the streets and sidewalks were empty of other motorists and pedestrians. *See id.* at 29. During the second chase, the defendant led officers through the same residential neighborhood at similar speeds. *Id.* at 27. This time, pedestrians walked the sidewalks and motorists travelled the roads, with at least one driver swerving to avoid a collision with the defendant. *Id.* The State levied two charges of reckless endangerment, one for each incident, and the jury convicted on both counts.

The Tennessee Supreme Court reviewed both convictions. It upheld the conviction stemming from the second incident because that chase had endangered the pedestrians "present on the sidewalks" and the motorists present on the roadways. *Id.* at 29. It reversed the conviction for the first incident, however, because the State "failed to show that" any member of the public had been in the zone of danger during the chase. *Id.* The result is that, under Tennessee law, functionally identical conduct can amount to reckless endangerment in circumstances where it in fact puts bystanders in imminent danger while falling short in contexts where no one stands in harm's way.

Tennessee's lower courts, and our own, have faithfully applied *Payne*'s zone-of-danger standard in cases involving the reckless use of firearms. In *State v. Alder*, 71 S.W.3d 299, 301, 305 (Tenn. Crim. App. 2001), for example, the Tennessee Court of Criminal Appeals confronted a case in which the defendant entered a local market where his wife was working and shot her at "point blank range." A second employee was standing between the defendant and the victim— just "a few feet away" from the victim—when the defendant fired the shot. *Id.* at 305. The State charged the defendant with reckless endangerment for exposing the bystander to harm and the jury returned a conviction. *Id.* at 303. The Court of Criminal Appeals affirmed, reasoning that the bystander was in the zone of danger because she stood in close enough proximity to both the victim and to the defendant's line of fire that there was a reasonable probability she would be "hit by a stray bullet." *See id.* at 305.

We applied the same reasoning in *United States v. Maxon*, 250 F. App'x 129 (6th Cir. 2007). The defendant in *Maxon* was a tenant of an apartment complex who "had recently acquired a new rifle" and decided to "test fire" it "from the patio of his" unit. *Id.* at 130. He did

so by discharging the weapon into the wall of a neighboring apartment building, an exercise that sent bullets over the heads of law enforcement officers and other pedestrians who "were present outside the complex." *Id.* at 133. The defendant's sentence was enhanced for reckless endangerment because of this conduct. *Id.* We affirmed, holding that by "shooting the gun into the air" in the "general direction" of bystanders "in the 'immediate vicinity,'" the defendant had "placed those individuals in a 'reasonable probability of danger.'" *Id.* at 133 (quoting *Payne*, 7 S.W.3d at 28); *accord United States v. Hyler*, 308 F. App'x 962, 963, 966 (6th Cir. 2009) (firing shots at an occupied vehicle "in a crowded parking lot while the driver of that vehicle fled" placed bystanders in the zone of danger); *United States v. Lester*, 238 F. App'x 80, 85 (6th Cir. 2007) (per curiam) (firing shots in the air with children playing less than twenty feet away placed children in the zone of danger); *United States v. Corbin*, 76 F. App'x 58, 59, 61 (6th Cir. 2003) (order) (firing shots at occupied car dealership placed occupants in the zone of danger).

Tennessee courts, and ours, have also reversed reckless endangerment determinations unsupported by evidence that the defendant's gunfire placed a bystander in the zone of danger. In one such case, *State v. Baldwin*, No. 01C01-9612-CR-00530, 1998 WL 426199 (Tenn. Crim. App. July 29, 1998), the defendant was a restaurant patron who, while seated at the establishment's bar, shot the bartender. *Id.* at *4. Another customer was dining at a table behind the defendant at the time. *Id.* The jury convicted the defendant of reckless endangerment for imperiling the nearby customer. *Id.* The Court of Criminal Appeals reversed, recognizing that the bystander was not in the line of fire and holding that the "mere speculation" that the bullet could have ricocheted through the restaurant did not amount to placing the onlooker in imminent danger. *See id.*; *accord Fox*, 947 S.W.2d at 865-66 & n.1 (firing shots into the air outside an apartment building with no one outside the building "in the immediate vicinity of the" defendant did not place anyone in the zone of danger); *State v. Woods*, No. E2008-01545-CCA-R3-CD, 2009 WL 2143988, at *4-5 (Tenn. Crim. App. July 20, 2009) (firing shots inside a mobile home in the opposite direction of someone who was fifteen feet away in another room did not place that person in the zone of danger).

We followed *Baldwin*'s lead in *Mukes*. The defendant there "allegedly fired four shots into the air" outside his home "between two and three a.m." after "a dispute with his girlfriend."

*Mukes*, 980 F.3d at 529-30, 535. The defendant's girlfriend was in the residence when the defendant fired the shots and no one else was outside "in the vicinity" of the defendant. *Id.* at 535. We held that absent evidence of anyone in the zone of danger, the defendant's enhancement for reckless endangerment could not stand. *Id.* at 535-36.

All these cases illustrate the same point: A violation of Tennessee's reckless endangerment statute accrues when—and only when—the defendant's reckless conduct places a member of the public in the zone of danger. Absent a finding that an identifiable bystander was in fact subject to a reasonable probability of death or serious bodily injury, a violation cannot attach.

In this case, the district court found that "Mr. Alvarado discharged the Ruger AR rifle from a trailer or the patio of that trailer in the vicinity of several residences at the trailer complex." R. 112, Sentencing Tr., PageID 1614. Residents of the complex, most notably Hufflin, "heard the nearby gun shots and testified to being scared, alarmed, and stressed as a result of Mr. Alvarado's conduct." R. 112, PageID 1614. "Ms. Hufflin specifically stated that based on what she heard, she thought the shots were fired" from a location near her home. R. 112, PageID 1614. Martinez was also close enough to Alvarado that "she shielded her child and covered" the child's ears when she heard the shots. R. 112, PageID 1615.

The district court's factual findings, including as to the position of the live rounds and spent casings, at most speak to Alvarado's location at the time he fired the gun—they do not identify the direction in which he fired it or the proximity of any bystander to his line of fire. The Government introduced no witness who testified to observing Alvarado fire the gun, conducted no ballistic analysis to plot the trajectory of his shots, and identified no property damage that would reveal the bullets' flight path. Nor did it introduce evidence showing that Martinez, her baby, or any other identifiable member of the public stood in front of Alvarado when he fired or could have been struck by a descending bullet. As a result, the record is silent on whether Alvarado fired the rifle into the air, into the ground, or somewhere else, and equally silent on whether any bystander was in fact endangered by his shots.

Without record evidence of anyone in proximity to Alvarado's "line of fire," or otherwise facing an imminent risk of harm, the Government cannot satisfy Tennessee's zone of danger requirement. *See Alder*, 71 S.W.3d at 304. The district court erred in applying a sentencing enhancement for reckless endangerment.

## 2. Harmless Error

Given the district court's error in applying a sentencing enhancement, we must "remand for resentencing unless we are certain that any such error was harmless." *McCarty*, 628 F.3d at 294 (quoting *Jeross*, 521 F.3d at 569). The Government bears the burden of proving that an error was harmless and "must demonstrate 'to the court with certainty that the error at sentencing did not cause the defendant to receive a more severe sentence.'" *United States v. Ziesel*, 38 F.4th 512, 519 (6th Cir. 2022) (alterations omitted) (quoting *United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009)).

We have at times found "misapplication in applying an enhancement harmless" when the district court explains that under the 18 U.S.C. § 3553(a) factors, it would have imposed the same sentence notwithstanding any enhancement. *United States v. Steel*, 609 F. App'x 851, 854 (6th Cir. 2015) (collecting cases). We do so where the district court has provided a justification that assures us the error was indeed harmless. *United States v. Walters*, No. 22-5930, 2023 WL 6601887, at *3 (6th Cir. Oct. 10, 2023). An "unadorned" or "boilerplate" "pledge that the district court would have come to the same result under the § 3553(a) factors had it calculated the Guidelines range correctly," however, is not enough. *United States v. Lucas*, No. 19-6390, 2021 WL 4099241, at *13 (6th Cir. Sept. 9, 2021) (quoting *United States v. Montgomery*, 969 F.3d 582, 583 (6th Cir. 2020)).

The district court here explained at sentencing that even if it had "sustained Mr. Alvarado's objections to the" sentencing enhancement, it "would have imposed the same term of imprisonment and the same term of supervised release" because of his "lack of respect for the law and the sheer dangerousness of his offense," observing that Alvarado was "lucky that no one was physically harmed or worse." R. 112, PageID 1636. The court's emphasis on the "dangerousness" of Alvarado's offense and on his good fortune that no one was injured link the

purportedly alternative basis for the sentence to the court's predicate determination that Alvarado put others in imminent danger.  As we have just discussed, the evidence does not support that premise.  We therefore cannot be "certain" that the district court's error in applying the sentencing enhancement was harmless.  *McCarty*, 628 F.3d at 294 (quoting *Jeross*, 521 F.3d at 569).  Accordingly, we vacate Alvarado's sentence and remand for resentencing.

### III.  CONCLUSION

For the reasons explained above, we **AFFIRM** Alvarado's conviction, **VACATE** his sentence, and **REMAND** to the district court for resentencing.