NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0418n.06

Case No. 23-1404

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Oct 23, 2024 |
| Plaintiff-Appellee, | ) | KELLY L. STEPHENS, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
|  | ) | THE EASTERN DISTRICT OF |
| DAVID JANKOWSKI, M.D., | ) | MICHIGAN |
|  | ) |  |
| Defendant-Appellant. | ) |  |
|  | ) | OPINION |

Before: CLAY, McKEAGUE, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Dr. David Jankowski's medical clinics relied on several unusual billing and prescription practices, many of which were later revealed to be illegal. Jankowski fraudulently billed Medicare for services he did not provide. And he prescribed controlled substances to patients whose conditions did not call for such treatment, with some patients unlawfully trafficking their prescribed drugs.

Following a trial, Jankowski was convicted of unlawful distribution of controlled substances, health care fraud, and conspiracy to commit the two offenses. On appeal, he challenges those convictions as well as his sentence. We affirm.

I.

David Jankowski was a licensed physician who specialized in pain management. He possessed a DEA license, which allowed him to prescribe and dispense controlled substances.

Jankowski offered pain management services through two corporate entities. One operated a clinic equipped with an in-house pharmacy stocked with narcotics and other controlled substances. Another functioned as a home-based healthcare practice that sent providers to patients' homes.

Jankowski was eligible to bill the federal Medicare program for these services. Together, his companies received $35.3 million in gross proceeds between 2011 and 2018. And over the course of about six years, Jankowski and his associates filled more than 3.4 million doses of Schedule II, III, and IV controlled substances. As the evidence at trial revealed, however, Jankowski's operations were rife with impropriety.

For example, Jankowski provided patients with unnecessary pain medication. Patients would later resell the pills, with one of Jankowski's patients becoming "the biggest pill dealer" in the community. These practices were so familiar that current patients would introduce new patients to Jankowski's clinics, with instructions to exaggerate their pain levels and pay cash in exchange for prescriptions from Jankowski. Besides seeing patients himself, Jankowski prepared pre-signed prescriptions so that unlicensed employees could prescribe controlled substances (albeit improperly) in his absence.

Jankowski's unwarranted practices did not end there. He billed Medicare for services he did not provide. By way of background, Medicare reimburses mid-level practitioners—physician assistants and nurse practitioners—at a higher rate when they render care under the direct supervision of a physician. With that in mind, Jankowski informed his billing company that mid-levels at his practice were always under his direct supervision, thereby justifying the higher rate, even when that was not true.

Following an FBI investigation, a grand jury indicted Jankowski on 46 counts, with one of his employees indicted as a co-conspirator on two counts. The indictment alleged one count of

conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349, 30 counts of the unlawful distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and 14 counts of health care fraud in violation of 18 U.S.C. § 1347. It also contained forfeiture allegations pursuant to 21 U.S.C. § 853, 18 U.S.C. §§ 981(a)(1)(C), 982(a), and 28 U.S.C. § 2461.

Ultimately, 32 counts proceeded to trial. As Special Agent Brian Koczenasz testified at trial, the FBI conducted its investigation into Jankowski partly through Henderson Butler, a confidential informant who posed as a patient at Jankowski's clinic while equipped with recording devices. The government played for the jury clips from five of those visits. Before and after the recordings were played, Koczenasz narrated what they depicted. The clips revealed conversations Butler had with employees at Jankowski's clinic, including medical assistant Haas, physician assistant Ruan, and nurse practitioner Spradlin. The evidence reflected many irregularities, including the fact that Jankowski did not always consult with Butler, the patient, even though the visits were billed under Jankowski's name.

The jury convicted Jankowski of 30 out of 32 counts. Following the denial of Jankowski's motion for judgment of acquittal and a subsequent forfeiture hearing, the district court imposed forfeiture in the amount of $35 million. It then sentenced Jankowski to 240 months' imprisonment, followed by three years of supervised release.

II.

A. Jankowski raises many issues on appeal. He first contends that the district court erred in denying his motion for judgment of acquittal for insufficiency of the evidence. *See* Fed. R. Crim. P. 29(a). According to Jankowski, the government, by relying on summaries of selected

3

claims, instead of the actual claims themselves, failed to show that he in fact submitted fraudulent claims to Medicare for reimbursement, a necessary element of his substantive health care fraud conviction. *See United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (defining the execution or attempted execution of fraud on a health care benefit program as an essential element of a conviction under 18 U.S.C. § 1347). Before the district court, however, Jankowski made different arguments. There, he argued that because the government failed to show that he had the requisite *mens rea* to be convicted of unlawfully distributing controlled substances, the government also lacked evidence to support the corresponding health care fraud charges. Yet despite raising these specific purported errors, Jankowski never argued that the government failed to admit evidence that he submitted fraudulent claims to Medicare. On appeal, he may not challenge the sufficiency of the evidence on grounds different than those he asserted in district court. *See United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002) ("Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived."); *United States v. Porter*, 886 F.3d 562, 566 (6th Cir. 2018) (order) (same). In other words, Jankowski waived the argument he now seeks to make on appeal.

After trial, Jankowski also challenged his health care fraud conspiracy conviction. We review the district court's denial of Jankowski's motion for a judgment of acquittal de novo. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). We ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Jankowski "bears a very heavy burden," as we must view the evidence "in the light most favorable to the government." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)); *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003) (quoting *United States v. Harrod*, 168

F.3d 887, 890 (6th Cir. 1999)). We cannot "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

To prove that Jankowski committed health care fraud in violation of 18 U.S.C. § 1347, the government had to prove that he "(1) created a scheme or artifice to defraud a health care program, (2) implemented the plan, and (3) acted with intent to defraud." *United States v. Bertram*, 900 F.3d 743, 748 (6th Cir. 2018) (quotation omitted). And to prove conspiracy under 18 U.S.C. § 1349, the government had to show that there was "an agreement between two or more persons to act together in committing [the] offense, and an overt act in furtherance of the conspiracy." *Hunt*, 521 F.3d at 647 (citation omitted). The government did not need to show a formal agreement between Jankowski and others to commit the offense, as demonstrating "a tacit or mutual understanding among the parties" is sufficient. *Id.* Likewise, circumstantial evidence is sufficient to support a conspiracy conviction. *Id.*

At trial, the government introduced sufficient evidence to convict Jankowski of conspiracy to commit healthcare fraud. The government provided evidence that Jankowski informed his billing company that he always directly supervised mid-level practitioners at his practice, allowing the company to bill under his name for a higher rate. Nevertheless, Jankowski did not always supervise mid-level practitioners for services billed under his name. Jankowski, for instance, prepared pre-signed forms for his employees to use when prescribing controlled substances to patients in his absence. Hamdan, who Jankowski knew was not licensed to practice medicine, used the pre-signed scripts to issue prescriptions at patients' homes when Jankowski was not present. Hamdan also prescribed medication at the clinic without consulting Jankowski, even though Hamdan did not have a medical license. Further, Hamdan testified that Jankowski

instructed Hamdan not to sign patient charts, so that Jankowski's signature would indicate that he had seen patients when he really had not. The evidence also showed that Jankowski's practice billed 221 claims to Medicare for services provided while Jankowski was out of state.

As this record reflects, Jankowski instructed various employees, including Hamdan, to write prescriptions and provide medical services without his consultation, while at the same time representing that Jankowski himself was the provider. All of this amounts to circumstantial evidence that Jankowski and Hamdan had at least a tacit agreement to implement a scheme to defraud a health care benefit program, and in turn performed overt acts to further than scheme. Thus, Jankowski's argument fails here.

B. Jankowski next contests, on both evidentiary and constitutional grounds, the use at trial of recordings made by Butler, the confidential informant. Because Jankowski did not object to the recordings' admission at trial, we review for plain error. *United States v. Lopez-Medina*, 461 F.3d 724, 746 (6th Cir. 2006); *United States v. Martinez*, 588 F.3d 301, 313 (6th Cir. 2009). That means Jankowski must show a clear or obvious error affecting both his substantial rights and "the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (quotation omitted). Such errors exist "only in exceptional circumstances." *Id.* (alteration adopted) (quotation omitted).

1. Beginning with his evidentiary argument, Jankowski contends that both Butler's recordings and Koczenasz's narrative descriptions of their contents constitute hearsay. The Federal Rules of Evidence define "hearsay" as "a statement that . . . the declarant does not make while testifying at the current trial," and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Generally, hearsay evidence is inadmissible unless an exception applies. *See* Fed. R. Evid. 802.

6

Many of the statements on the Butler recordings, as testified to by Koczenasz, were not hearsay because they were not offered for the truth of the matter asserted. Rather, these recordings were offered to show their effect on the listener. *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay."). In the recordings, Butler discussed his physical health, pain levels, and possible drug treatment. Take, for example, two statements Butler made to a physician assistant Ruan—that Butler was on Medicare because of psychiatric conditions, and that Butler requested a drug "stronger than Norco." Neither was offered to prove the "truth of the matter asserted," namely, Butler's coverage status or his desire for a powerful drug. *Id.* Rather, they were introduced to show the effect of those statements on Ruan, the listener. Indeed, after Butler requested a stronger medication, Ruan said that he would prescribe him "an increase in strength in Norco as well as number." The government's purpose was to demonstrate how Ruan understood the request, meaning the statements were admissible "to show why [Ruan] acted as [he] did." *Id.* Accordingly, none of these statements on the recording are hearsay.

The remaining statements on the recordings are those made by Jankowski's employees. That turns our focus more to the speakers than to the content of their statements. Even if offered for their truth, statements do not qualify as hearsay if they are "offered against an opposing party," and are "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). The declarants, with whom Butler met and recorded, were employees at Jankowski's clinic: a medical assistant (Haas), a physician assistant (Ruan), a nurse practitioner (Spradlin), and an administrative employee. All were speaking to Butler as employees. All were speaking about matters within the scope of their employment.

And all of their statements were offered against Jankowski. Their utterances are thus admissible as statements of a party-opponent. *See Stalbosky v. Belew*, 205 F.3d 890, 895 (6th Cir. 2000).

Resisting this conclusion, Jankowski contends that the government did not show that he exercised the requisite level of control over his employees for them to be considered his agents or employees for purposes of Rule 801(d)(2)(D). He points us to *United States v. Wiedyk*, 71 F.3d 602 (6th Cir. 1995). There, the defendant served as "Office Manager" for a fund, and we considered whether an employee who worked for a company hired by the fund was the defendant's agent for purposes of Rule 801(d)(2)(D). *Id.* at 605–06. For the declarant to be considered the defendant's agent, we reasoned, the government had to show both that the declarant was an agent of the fund and that the "defendant's control over the Fund," as office manager, was "so extensive as to have the Fund's role as principal imputed to [him]." *Id.* at 606. Because the government failed to establish that the defendant had the requisite control, we held that the employee was not the defendant's agent, meaning the employee's out-of-court statement was not admissible against the defendant under Rule 801(d)(2)(D). *Id.* Here, by contrast, the government established that Jankowski was the owner of—and exercised sufficient control over—the entities that employed the declarants. *See id.* (discussing the ownership of the corporation where the agent is employed as probative of the defendant-agent relationship). Those employees accordingly qualify as Jankowski's agents.

It makes no difference that, as Jankowski asserts, each "employee had their own independent prescribing credentials, and that each prescription issued was based on that prescriber's" judgment. Independent authority is not the test for whether an employee's statement is admissible under Rule 801(d)(2)(D). Rather, we ask "whether the statement *concerns* a matter within the scope of the agency or employment." *Jacklyn v. Schering-Plough Healthcare Prods.*

8

*Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). Here, each employee was discussing matters directly related to Jankowski's medical practice, for example, MRI test results, insurance coverage, prescriptions, and billing. Their statements thus fall well within the scope of their employment.

Finally, Koceznasz's testimony about these recordings was similarly not hearsay or hearsay-within-hearsay, as Jankowski alleges. Koceznasz merely identified the parties on the recordings and occasionally paraphrased or quoted from them. Simply relating non-hearsay statements to the jury does not transform the statements into inadmissible hearsay. *See United States v. Cook*, 13 F. App'x 331, 336 (6th Cir. 2001) (agent's testimony was properly admitted because it was "merely relating" non-hearsay statements to the jury). In other instances, he testified only about what *did not* happen on the recordings. These comments do not report out-of-court statements, but the lack of any statement, and accordingly are not hearsay. Thus, Koceznasz's testimony was properly admitted.

2. We turn next to Jankowski's assertion that the admission of the undercover recordings violated the Sixth Amendment's Confrontation Clause. "In all criminal prosecutions," the Clause instructs, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. We understand this command to mean that "testimonial, out-of-court statements offered against the accused to establish the truth of the matter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant." *United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004) (citation omitted).

As already discussed, several pieces of testimony Jankowski challenges were not statements, whether under the Rules of Evidence or for the purpose of Confrontation Clause analysis. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9. For example, testimony that there

was no discussion in the recordings of Butler's failed drug tests do not report out-of-court statements but report the lack of one. Other statements Jankowski challenges, like Butler's statements on the recordings, were not offered for their truth and, therefore, do not implicate the Confrontation Clause. *See id.*

Consider now statements made by Haas, Ruan, Spradlin, and the office worker to the confidential informant. And assume they were introduced for their truth. Even then, the Confrontation Clause is implicated only "[w]here testimonial evidence is at issue." *Id.* at 68. Are Jankowski's employees' statements testimonial? To discern an answer, we ask "whether the declarant intend[ed] to bear testimony against the accused." *Cromer*, 389 F.3d at 675. Said differently, would "a reasonable person in the declarant's position . . . [have] anticipate[d] his statement being used against the accused in investigating and prosecuting the crime[?]" *Id.*

Statements made to government agents are typically considered testimonial. *See Crawford*, 541 U.S. at 53 (explaining that "interrogations by law enforcement officers fall squarely within" the class of testimonial hearsay). But what about when, as here, the agent is a confidential government informant? If the declarant is unaware the individual to whom they are speaking is conducting an investigation, then the declarant's statement is not considered testimonial. *See Davis v. Washington*, 547 U.S. 813, 825 (2006); *United States v. Mooneyham*, 473 F.3d 280, 287 (6th Cir. 2007). As Jankowski's employees were not aware that Butler was a government informant, they could not have anticipated that their statements would be used against Jankowski in a criminal trial. *See Cromer*, 389 F.3d at 675. Said differently, their statements were made "unwittingly." *Davis*, 547 U.S. at 825. Those statements thus were not testimonial, meaning their admission did not violate the Confrontation Clause.

We next consider Koczenasz's testimony in the Confrontation Clause context. In the testimony that Jankowski challenges, Koczenasz described statements made by Butler or Jankowski's employees on the recordings played to the jury. Thus, his testimony did not violate the Confrontation Clause, because, as discussed above, the statements—or lack thereof—made by Butler and the employees did not themselves violate the Clause. *See United States v. Tragas*, 727 F.3d 610, 615 (6th Cir. 2013) ("[W]e find no inherent problem—constitutional or otherwise— when a prosecutor and a witness merely read aloud from a properly admitted transcript . . . .").

C. Jankowski also asks us to reverse his drug distribution convictions on the basis that the district court erred by failing to define an essential element of those crimes in the jury instructions.

Whether the district court erred is ultimately beside the point because Jankowski requested the instructions that were read to the jury. In that instance, we customarily decline appellate review under the invited-error doctrine. *See United States v. Howard*, 947 F.3d 936, 944–45 (6th Cir. 2020); *United States v. Sharpe*, 996 F.2d 125, 128–29 (6th Cir. 1993). That doctrine reflects "the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Sharpe*, 996 F.2d at 129 (quotation omitted) (citation omitted). True, the doctrine is not limitless; it does not preclude relief "when the interests of justice demand otherwise." *Howard*, 947 F.3d at 945 (quotation omitted) (citation omitted). That can be the case, for example, where the government is as much at fault for provoking the error as is the defendant. *Id.* But that is not what happened here. The government proposed different jury instructions, but ultimately "went with [Jankowski's] version." In short, Jankowski invited any error of which he now complains, and the government is not equally at fault in introducing the error. We therefore decline to review his challenge to the jury instructions.

11

D. Next, Jankowski argues that the district court clearly erred in calculating the loss amount used at sentencing. The district court adopted the probation office's loss amount calculation of $35 million. As Jankowski objected to the district court's sentence and the loss amount, we review the court's factual findings as to the amount of loss for clear error and its legal methodology de novo. *See United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011).

Because any errors did not affect the ultimate Sentencing Guidelines range or the sentence imposed, they are harmless and thus do not require resentencing. *See United States v. Castro*, 960 F.3d 857, 867 (6th Cir. 2020); *see also United States v. Alvarado*, 95 F.4th 1047, 1056 (6th Cir. 2024) (explaining that the government carries the burden to show harmlessness). To see why, look back to the sentencing proceedings. There, the district court adopted the probation office's Guidelines calculation. That calculation was based on U.S. Sent'g Guidelines Manual § 3D1.2(d) (U.S. Sent'g Comm'n 2023), which groups, for sentencing, "[a]ll counts involving substantially the same harm," and uses the higher total offense level to determine the Guidelines range, *id.* § 3D1.4. Based on that provision, Jankowski's counts of conviction fell into two groups: Group 1 (the drug distribution counts, Counts 1, 15–21, 23–26, 28–32), and Group 2 (the health care fraud counts, Counts 2, 33–37, 39–45). As the offense level for the drug counts was higher than the offense level for the health care fraud counts, the Guidelines range was based on Group 1. U.S. Sent'g Guidelines Manual § 3D1.3(b) (U.S. Sent'g Comm'n 2001).

Jankowski's challenge to the loss amount focused solely on whether the loss amount should be limited to the "actual loss" to Medicare. The loss amount, limited to losses suffered by Medicare or not, could only affect the offense level for Group 2. Yet, as just explained, Group 1 drove the ultimate Guidelines calculation. That means the errors posited by Jankowski were harmless as to his actual Guidelines calculation as well as the sentence the district court later

imposed, which varied downward from the Guidelines range based on factors enumerated in 18 U.S.C. § 3553(a). *See United States v. Johnson*, 79 F.4th 684, 709 (6th Cir. 2023) (citing *United States v. Hills*, 27 F.4th 1155, 1195 (6th Cir. 2022)). Jankowski's ultimate Guidelines range depended only on the drug distribution counts, for which the loss amount was of no consequence. Even the additional one point for his health care fraud counts did not affect his Guidelines range.

E. Jankowski next argues that the $35 million forfeiture order imposed on him was based on insufficient evidence. We review the district court's "interpretation of federal forfeiture laws *de novo*," *United States v. Hampton*, 732 F.3d 687, 690 (6th Cir. 2013), and its factual findings for clear error, *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001). As Jankowski was convicted of both drug and health care fraud crimes, he was subject to forfeiture for both sets of offenses. 21 U.S.C. § 853(a)(1); 18 U.S.C. § 982(a)(7). In debating the forfeiture order's propriety, the parties focus primarily on the fraud crimes. As these offenses are sufficient to support the district court's forfeiture award, we turn our attention there.

Jankowski's convictions for health care fraud subject him to a forfeiture penalty of the "gross proceeds traceable to the commission of the offense," whether "directly or indirectly." 18 U.S.C. § 982(a)(7). Given that the statute uses the term "indirectly," we understand "proceeds" to have a wide berth. For example, monies derived from a fraud conspiracy can "touch[] everything" from "banking accounts to . . . day-to-day operations." *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014); *see also United States v. Warshak*, 631 F.3d 266, 332 (6th Cir. 2010) (holding entirety of revenue constituted forfeitable proceeds).

The order here fits comfortably within these parameters. In arriving at the $35 million figure, the district court reviewed the evidence at trial and the arguments made in the forfeiture briefing, at the forfeiture hearing, and at sentencing. *See* Fed. R. Crim. P. 32.2(b). At trial, the

government introduced evidence that Jankowski's corporate entities brought in $35.3 million in revenue between 2010 and 2018. Jankowski's fraud scheme centered on his illegal drug activities, all masquerading as legitimate medical services. The scheme's illegality touched all parts of his operation, from the purchases of medical supplies and drugs for the clinic to payouts to co-conspirators to carry out the scheme. Thus, the district court concluded that Jankowski's medical practices were tantamount to "prescription mill[s]." From these findings, the $35.3 million figure represents both direct proceeds of Jankowski's crimes, as well as indirect proceeds to maintain the fraudulent appearances. *See Warshak*, 631 F.3d at 332–33. We see no clear error in the district court's finding nor any error in its legal analysis. *See O'Dell*, 247 F.3d at 679.

Jankowski resists this conclusion. He first argues that the $35 million figure is "inflated," in part because one corporate entity was a multispecialty group with at least some providers who were not involved in the scheme. But he points to no binding authority allowing the carve-out of "legitimate" revenue in the forfeiture of health care fraud proceeds. *See United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019) (noting that while "other forfeiture statutes allow credit for 'lawful services' . . . the statute for health care fraud does not"). Rather, our prior cases read "proceeds" generously, in line with the statutory text. *See Warshak*, 631 F.3d at 332. *Warshak* illustrates the point. There, we rejected the defendant's request to carve out legitimate revenue from fraudulent revenue in a widespread business fraud scheme. *Id.* We reasoned that "everything [could be] attributable to fraud," and concluded that the district court was correct to deduce "that the entire operation was permeated with fraud." *Id.* (quotation omitted). This was so because, even in the presence of legitimate business and attempted ameliorative measures by the company, "the very nucleus of its business model remained rotten and malignant." *Id.* As a result, even supposedly legitimate business income was subject to forfeiture as the "indirect" result of a

14

conspiracy to commit fraud, as those proceeds likely would not have been earned had the business been clean. *Id.* at 332–33. So too here. On this record, we see no reason to question the district court's conclusion that, like in *Warshak*, the entirety of Jankowski's operations was infected with fraud.

Jankowski also takes issue with the district court's reliance on summaries of his bank records, believing that those exhibits "fail to establish a reasonable basis for the imposition of the district court's $35 million forfeiture order." We disagree. The summary exhibits were admitted at trial without objection, and thus could fairly be the basis for the court's forfeiture calculations. *See* Fed. R. Crim. P. 32.2(b)(1)(B). We likewise disagree with Jankowski that the government "failed to link the [$35.3 million] with any of the purported fraud in the case." Because evidence supported that Jankowski's corporate entities were a "vehicle to commit fraud," and that fraud "touched everything" in his business operations, those entities' total revenue is subject to forfeiture. *Smith*, 749 F.3d at 488; *see also Warshak*, 631 F.3d at 332 (holding that forfeiture of entire business revenue was supported where the business was "permeated with fraud").

F. As a familiar last resort, Jankowski argues that we should reverse his conviction under the cumulative error doctrine. "[T]o obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). Though he labels them under the rubric of cumulative error, Jankowski actually raises new claims. The errors he points to are the admission of various exhibits that the government purportedly "fail[ed] to identify, authenticate, and move" into the record. But as Jankowski did not object to the admission of those exhibits, we will afford him relief "only if the trial court's evidentiary

15

decision was plainly erroneous, thus affecting [Jankowski's] substantial rights and resulting in a miscarriage of justice." *United States v. Dunnican*, 961 F.3d 859, 871 (2020) (quotation omitted)

Federal Rule of Evidence 901 governs the identification and authentication of evidence. "To satisfy the requirement of authenticating or identifying an item of evidence," the Rule instructs, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). One method supporting authentication is witness testimony stating that "an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

Jankowski first asserts that the admission of exhibits reflecting undercover recordings made by Butler and corresponding transcripts violated Rule 901. He appears to be correct that the government failed formally to move to admit the recordings into evidence before they were shown to the jury or taken to the jury room. In that instance, the error is nonetheless harmless so long as "[a] proper foundation ha[s] been laid for the tape and the defendant[] did not question the tape's authenticity or accuracy." *United States v. Scaife*, 749 F.2d 338, 347 (6th Cir. 1984).

Those markers were satisfied here. Before playing the recordings, Koczenasz explained to the jury the functionality of the recording instruments Butler carried into the clinic. He testified that Butler had "both audio and visual" devices, and that the FBI was monitoring the audio feed live. He added that, to his knowledge, Butler did not turn off the devices, nor had agents detected any tampering with them. And Koczenasz narrated the contents of each recording before it was played before the jury. Testimony of this sort typically is adequate to establish the recordings' "accuracy and trustworthiness." *United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004). Therefore, any error in sending the recordings to the jury without moving first to admit them was harmless. *Vonner*, 516 F.3d at 386.

16

Next, Jankowski contends that the government failed to identify, authenticate, and move to admit exhibits regarding Jankowski's prescribing practices. Not so. Koczenasz identified the exhibits as prescriptions Jankowski issued for Butler, describing the context in which they were prescribed and noting the medications they listed. This was sufficient to show that the exhibits were authenticated and thus that a proper foundation was laid for their admission. *See United States v. Thomas*, 701 F. App'x 414, 418 (6th Cir. 2017). Further, the government moved "the entire . . . series" into evidence in accordance with a stipulation agreed to by Jankowski, and the district court accepted the exhibits as evidence. In short, no error occurred.

Similarly, Jankowski argues that other exhibits were improperly admitted because the government "simply identif[ied] and read" them "into the record." These exhibits were discovered during a lawful search of Jankowski's clinics. Koczenasz testified concerning the execution of the search warrants. He testified that each challenged exhibit was discovered pursuant to the warrants on Jankowski's clinics, and, upon seizure, logged and secured per FBI procedure. He further authenticated each exhibit by identifying it. So there was no error in the district court's reliance on these exhibits. *See United States v. Mehmood*, 742 F. App'x 928, 938–39 (6th Cir. 2018); *United States v. Bruce*, 437 F. App'x 357, 362 (6th Cir. 2011).

Jankowski also comes up short in challenging as improperly admitted three other exhibits identified by a witness as summaries of Jankowski's Medicare billing. The witness also testified to their accuracy. Following this testimony, the government moved to admit the exhibits. Jankowski agreed to their admission provided that the underlying data was admitted as well, which it was. Accordingly, no error occurred.

Finally, Jankowski challenges the admission of six other exhibits regarding medical benefits payments. Although the record is not entirely clear, it appears that a witness identified

these exhibits as 855Rs, forms by which a provider "reassign[s] benefits" to groups already established with Medicare. That explanation seemingly shows that the exhibits were as advertised. *See* Fed. R. Evid. 901(b)(1). At the very least, no plain error occurred. Testimonial evidence that Jankowski committed health care fraud and conspired to do so was sufficient to sustain his conviction even absent these exhibits.

\*     \*     \*     \*     \*

We affirm Jankowski's conviction and sentence.